**EXHIBIT A**

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION**

| | | |
|---|---|---|
| **CARDINAL HEALTH 110, LLC**, | ) | CASE NO. 1:25-cv-00191 |
| | ) | |
| *Plaintiff*, | ) | JUDGE FERNANDO RODRIGUEZ, JR. |
| | ) | |
| -vs- | ) | MAGISTRATE IGNACIO TORTEYA, III |
| | ) | |
| **SRINIVASA TALLA**, *et al.*, | ) | **FIRST AMENDED COMPLAINT** |
| | ) | |
| *Defendants*. | ) | **(Jury Demanded)** |

Plaintiff Cardinal Health 110, LLC ("<u>CH 110</u>" or "<u>Plaintiff</u>"), by and through undersigned counsel, for its *First Amended Complaint* against (i) Srinivasa Talla; (ii) Brownsville Pharmacy #3, LLC d/b/a Autrey Pharmacy 3; (iii) Harlingen Pharmacy, LLC; (iv) Brownsville Pharmacy #4, LLC d/b/a Autrey Pharmacy 4; (v) Brownsville Pharmacy #2, LLC d/b/a Autrey Pharmacy 2; (vi) Srinivas Gadiraju; and (vii) Fry Pharmacy, LLC (collectively, the "<u>Defendants</u>") hereby states and alleges as follows:

<div align="center"><u>THE PARTIES</u></div>

1.      CH 110 is a limited liability company duly organized in the State of Delaware and authorized to do business in Ohio, among other states, with its principal place of business located at the address set forth in the caption of this *Complaint*. CH 110 is a subsidiary of Cardinal Health, Inc., and, among other things, specializes in the distribution of pharmaceutical products and the furnishing of related services.

2.      Defendant Srinivas Talla ("<u>Talla</u>") is an individual of full age and majority who resides at 406 Vassar Place, Fishkill, New York 12524.

3.      Defendant Brownsville Pharmacy #3, LLC d/b/a Autrey Pharmacy 3 ("<u>BP3</u>") is a limited liability company duly organized in the State of Texas whose principal place of business

<div align="center">1</div>

is located at 800 East Alton Gloor Boulevard, Unit B, Brownsville, Texas 78526.

4.     Defendant Harlingen Pharmacy, LLC ("HP") is a limited liability company duly organized in the State of Texas whose principal place of business is located at 1616 North Ed Carey Drive, Harlingen, Texas 78550.

5.     Defendant Brownsville Pharmacy #4, LLC d/b/a Autrey Pharmacy 4 ("BP4") is a limited liability company duly organized in the State of Texas whose principal place of business is located at 3503 Boca Chica Boulevard, Suite 1, Brownsville, Texas 78521.

6.     Defendant Brownsville Pharmacy #2, LLC d/b/a Autrey Pharmacy 2 ("BP2") is a limited liability company duly organized in the State of Texas whose principal place of business is located at 1365 East Ruben Torres SR Boulevard, Brownsville, Texas 78521.

7.     Defendant Srinivas Gadiraju ("Gadiraju") is an individual of full age and majority who resides at 1 Overlook Drive, Riverdale, New Jersey 07457.

8.     Defendant Fry Pharmacy, LLC ("Fry") is a limited liability company duly organized in the State of Texas whose principal place of business is located at 311 North Sam Houston Boulevard, San Benito, Texas 78586.

### JURISDICTION AND VENUE

9.     CH 110 is an Ohio corporation with its principal place of business in Ohio.

10.     This Court possesses personal jurisdiction over Defendants BP3, HP, BP4, BP2, and Fry because Defendants have their principal place of business located in the State of Texas.

11.     This Court possesses personal jurisdiction over Defendants Talla and Gadiraju pursuant to Section 17.042 of the Texas Civil Practice and Remedies Code. Talla and Gadiraju own real property in Texas. As set forth below Talla and Gadiraju were also personal guarantors for five (5) pharmacies that conducted business in Texas for many years and failed to comply with

2

their payment obligations arising in Texas. Those pharmacies, which were owned and/or managed by Talla and Gadiraju, sold goods to Texas residents.

12.    Defendants received the funds at issue in this lawsuit in Texas.

13.    This Court possesses diversity subject matter jurisdiction pursuant to 28 U.S.C. § 1332.

14.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b).

**FACTUAL BACKGROUND**

**The Credit Applications and the Personal Guaranties**

16.    This matter relates to a refund program created by CH 110 where participants would return certain pharmaceutical products to CH 110's third party returns processor.

17.    Before participating in this refund program, a participant must have an established line of credit with CH 110 by virtue of a credit application.

18.    BP3, HP, BP4, BP2, and Fry (collectively, the "Entity Defendants") each executed separate credit applications while Talla and Gadiraju (collectively, the "Guarantor Defendants") executed personal guaranties for those credit applications. Specifically:

(a)    Or about March 2, 2015, BP3 executed a final credit application to CH 110 (the "BP3 Credit Application"), and Talla (the "BP3 Guarantor") executed a personal guaranty (the "BP3 Guaranty") as part of the BP3 Credit Application. A true and accurate copy of the BP3 Credit Application, with confidential information redacted, is attached hereto as **Exhibit 1** and incorporated by this reference.

(b)    On or about March 17, 2014, HP executed a final credit application to CH 110 (the "HP Credit Application"), and Talla (the "HP Guarantor") executed a personal guaranty (the "HP Guaranty") as part of the HP Credit Application. A true, accurate, and complete copy of the HP Credit Application containing the HP Guaranty, with confidential

3

information redacted, is attached hereto as **Exhibit 2** and incorporated by this reference.

(c) On or about July 15, 2017, BP4 executed a final credit application to CH 110 (the "BP4 Credit Application"), and Talla (the "BP4 Guarantor") executed a personal guaranty (the "BP4 Guaranty") as part of the BP4 Credit Application. A true, accurate, and complete copy of the BP4 Credit Application containing the BP4 Guaranty, with confidential information redacted, is attached hereto as **Exhibit 3** and incorporated by this reference.

(d) On or about December 3, 2012, BP2 executed a final credit application to CH 110 (the "BP2 Credit Application"), and Talla and Gadiraju (the "BP2 Guarantors") executed personal guaranties (the "BP2 Guaranties") as part of the BP2 Credit Application. A true, accurate, and complete copy of the BP2 Credit Application containing the BP2 Guaranties, with confidential information redacted, is attached hereto as **Exhibit 4** and incorporated by this reference.

(e) On or about October 13, 2015, Fry executed a final credit application to CH 110 (the "Fry Credit Application"), and Talla and Gadiraju (the "Fry Guarantors") executed personal guaranties (the "Fry Guaranties") as part of the Fry Credit Application. A true, accurate, and complete copy of the Fry Credit Application containing the Fry Guaranties, with confidential information redacted, is attached hereto as **Exhibit 5** and incorporated by this reference.

### The Prefund Program

19. If a participant was already a CH 110 customer and they were otherwise qualified, a participant could then take part in a program designed by CH 110 whereby it could return and deliver certain pharmaceutical products purchased by the participant from CH 110 (the

4

"Returnable Goods").

20.    Participants were required to execute a separate enrollment form with CH 110 to participate in the program.

21.    Participants would return and deliver to CH 110 Returnable Goods, and upon receipt of the Returnable Goods, CH 110 would prefund the return amount to such participants by paying them a percentage of the refund amounts.

22.    CH 110 would thereafter return the Returnable Goods to certain manufacturers to receive funds (the "Prefund Program").

23.    In accordance with the terms of the Prefund Program, participants were required to return only Returnable Goods to CH 110 to be eligible to receive a prefund.

24.    Because the terms of the Prefund Program specify what pharmaceutical products qualify as Returnable Goods, participants were aware of such qualifications when participating in the Prefund Program.

25.    All Defendants engaged with CH 110 pursuant to, and became participants in, the Prefund Program. Specifically:

(a)    On or about January 23, 2020, BP3 entered into the Prefund Program. A true, accurate, and complete copy of the BP3 enrollment form, with confidential information redacted, is attached hereto as **Exhibit 6** and incorporated by this reference.

(b)    On or about January 30, 2020, HP entered into the Prefund Program. A true, accurate, and complete copy of the HP enrollment form, with confidential information redacted, is attached hereto as **Exhibit 7** and incorporated by this reference.

(c)    On or about January 23, 2020, BP4 entered into the Prefund Program. A true, accurate, and complete copy of the BP4 enrollment form, with confidential

information redacted, is attached hereto as **Exhibit 8** and incorporated by this reference.

(d)   On or about January 24, 2020, BP2 entered into the Prefund Program. A true, accurate, and complete copy of the BP2 enrollment form, with confidential information redacted, is attached hereto as **Exhibit 9** and incorporated by this reference.

(e)   On or about January 24, 2020, Fry entered into the Prefund Program. A true, accurate, and complete copy of the Fry enrollment form, with confidential information redacted, is attached hereto as **Exhibit 10** and incorporated by this reference.

26.   Defendant Talla is the owner and/or personal guarantor of each Entity Defendant named in this lawsuit and was involved in sending certain goods to CH 110 in anticipation of receiving a refund under the Prefund Program.

### The BP3 Breaches

27.   Prior to participating in the Prefund Program, CH 110 and BP3 entered into the BP3 Credit Application.

28.   On or about January 23, 2020, BP3 agreed to participate in the Prefund Program as part of its dealings with CH 110. The Prefund Program expanded upon the BP3 Credit Application and became a single contract (the "BP3 Contract").

29.   The BP3 Contract sets forth CH 110's agreement with BP3 to accept orders from BP3 on credit in exchange for BP3's agreement to pay for such orders in accordance with the established payment terms.

30.   Between May 2021 and June 2023, BP3, Talla, and Gadiraju (collectively, the "BP3 Defendants") submitted Returnable Goods to CH 110 pursuant to the Prefund Program (the "Received BP3 Goods").

31.   Thereafter, and upon request by BP3, CH 110 prefunded the sum of $341,829.87

to BP3 pursuant to the BP3 Contract (the "BP3 Funds").

32.     However, after CH 110 returned the BP3 Returned Goods to the manufacturer, the requests for reimbursement were rejected because the BP3 Returned Goods were not Returnable Goods.

33.     The BP3 Defendants submitted the Received BP3 Goods to CH 110 knowing that they did not qualify as Returnable Goods and knowing that they would ultimately be rejected by the manufacturer.

34.     On or about February 8, 2024, after CH 110's rebate requests were denied by the manufacturer, CH 110 contacted the BP3 Defendants to demand the return of the BP3 Funds.

35.     CH 110 presented a formal demand for repayment to BP3 on February 8, 2024. A true and accurate copy of CH 110's demand letter is attached hereto as **Exhibit 11**.

36.     To date, the BP3 Defendants have refused to repay CH 110 the BP3 Funds.

### The HP Breaches

37.     Prior to participating in the Prefund Program, CH 110 and HP entered into the HP Credit Application.

38.     On or about January 30, 2020, HP agreed to participate in the Prefund Program as part of its dealings with CH 110. The Prefund Program expanded upon the HP Credit Application and became a single contract (the "HP Contract").

39.     The HP Contract sets forth CH 110's agreement with HP to accept orders from HP on credit in exchange for HP's agreement to pay for such orders in full accordance with the established payment terms. The HP Contract also gives CH 110 the right to, among other things, recover its attorneys' fees and costs related to collecting any amounts due under the contract. See, Sect. III(4).

7

40.     Between June 2021 and June 2023, HP and Talla (collectively, the "HP Defendants") submitted Returned Goods to CH 110 pursuant to the Prefund Program (the "Received HP Goods").

41.     Thereafter, and upon request by HP, CH 110 prefunded the sum of $298,338.19 to HP pursuant to the HP Contract (the "HP Funds").

42.     However, after CH 110 returned the Received HP Goods to the manufacturer, the requests for reimbursement were rejected because the Received HP Goods were not Returnable Goods.

43.     The HP Defendants submitted the Received HP Goods to CH 110 knowing that they did not qualify as Returnable Goods and knowing that they would ultimately be rejected by the manufacturer.

44.     On or about February 8, 2024, after CH 110's refund requests were denied by the manufacturer, CH 110 contacted the HP Defendants to demand the return of the HP Funds.

45.     CH 110 presented a formal demand for repayment to HP on February 8, 2024. A true and accurate copy of CH 110's demand letter is attached hereto as **Exhibit 12**.

46.     To date, the HP Defendants have refused to repay CH 110 the HP Funds.

### The BP4 Breaches

47.     Prior to participating in the Prefund Program, CH 110 and BP4 entered into the BP4 Credit Application.

48.     On or about January 23, 2020, BP4 agreed to participate in the Prefund Program as part of its dealings with CH 110. The Prefund Program expanded upon the BP4 Credit Application and became a single contract (the "BP4 Contract").

49.     The BP4 Contract sets forth CH 110's agreement with BP4 to accept orders from

8

BP4 on credit in exchange for BP4's agreement to pay for such orders in full accordance with the established payment terms. The BP4 Contract also gives CH 110 the right to, among other things, recover its attorneys' fees and costs related to collecting any amounts due under the contract. See, Sect. III(4).

50.   On or between June 2021 and June 2023, BP4, Talla, and Gadiraju (collectively, the "BP4 Defendants") submitted Returnable Goods to CH 110 pursuant to the Prefund Program (the "Received BP4 Goods").

51.   Thereafter, and upon request by BP4, CH 110 prefunded the sum of $295,495.11 to BP4 pursuant to the BP4 Contract (the "BP4 Funds").

52.   However, after CH 110 returned the Received BP4 Goods to the manufacturer, the requests for reimbursement were rejected because the Received BP4 Goods were not Returnable Goods.

53.   The BP4 Defendants submitted the Received BP4 Goods to CH 110 knowing that they did not qualify as Returnable Goods and knowing that they would ultimately be rejected by the manufacturer.

54.   On or about February 8, 2024, after CH 110's refund requests were denied by the manufacturer, CH 110 contacted the BP4 Defendants to demand the return of the BP4 Funds.

55.   CH 110 presented a formal demand for repayment to BP4 on February 8, 2024. A true and accurate copy of CH 110's demand letter is attached hereto as **Exhibit 13**.

56.   To date, the BP4 Defendants have refused to repay CH 110 the BP4 Funds.

### The BP4 Product Purchases

57.   Additionally, BP4 purchased products from CH 110 pursuant to the BP4 Credit Application. See, Ex. 3.

58.    As set forth above, Talla was a personal guarantor in relation to the BP4 Credit Application.

59.    Pursuant to the BP4 Credit Application, CH 110 furnished products to BP4.

60.    Thereafter, BP4 failed to pay CH 110 $16,123.00 in relation to its orders.

61.    To date, neither BP4 nor Talla has paid CH 110 in relation to the outstanding balance due and owing related to products.

### The BP2 Breaches

62.    Prior to participating in the Prefund Program, CH 110 and BP2 entered into the BP2 Credit Application.

63.    On or about January 24, 2020, BP2 agreed to participate in the Prefund Program as part of its dealings with CH 110. The Prefund Program expanded upon the BP2 Credit Application and became a single contract (the "BP2 Contract").

64.    The BP2 Contract sets forth CH 110's agreement with BP2 to accept orders from BP2 on credit in exchange for BP2's agreement to pay for such orders in relation to the specified payment terms. The BP2 Contract also gives CH 110 the right to, among other things, recover its attorneys' fees and costs related to collecting any amounts due under the contract. See, Sect. III(4).

65.    Between May 2021 and June 2023, BP2, Talla, and Gadiraju (the "BP2 Defendants") submitted Returnable Goods to CH 110 pursuant to the Prefund Program (the "Received BP2 Goods").

66.    Thereafter, and upon request by BP2, CH 110 prefunded the sum of $178,137.62 to BP2 pursuant to the BP2 Contract (the "BP2 Funds").

67.    However, after CH 110 returned the Received BP2 Goods to the manufacturer, the requests for reimbursement were rejected because the Received BP2 Goods were not Returnable

Goods.

68.     The BP2 Defendants submitted the Received BP2 Goods to CH 110 knowing that they did not qualify as Returnable Goods and knowing that they would ultimately be rejected by the manufacturer.

69.     On or about February 8, 2024, after CH 110's refund requests were denied by the manufacturer, CH 110 contacted the BP2 Defendants to demand the return of the BP2 Funds.

70.     CH 110 presented a formal demand for repayment to BP3 on February 8, 2024. A true and accurate copy of CH 110's demand letter is attached hereto as **Exhibit 14**.

71.     To date, the BP2 Defendants have refused to repay CH 110 the BP2 Funds.

### The Fry Breaches

72.     Prior to participating in the Prefund Program, CH 110 and Fry entered into the Fry Credit Application.

73.     On or about January 24, 2020, Fry agreed to participate in the Prefund Program as part of its dealings with CH 110. The Prefund Program expanded upon the Fry Credit Application and became a single contract (the "Fry Contract").

74.     The Fry Contract sets forth CH 110's agreement with Fry to accept orders from Fry on credit in exchange for Fry's agreement to pay for such orders in full accordance with the established payment terms. The Fry Contract also gives CH 110 the right to, among other things, recover its attorneys' fees and costs related to collecting any amounts due under the contract. See, Sect. III(4).

75.     Between June 2021 and June 2023, Fry, Talla, and Gadiraju (collectively the "Fry Defendants") submitted Returned Goods to CH 110 pursuant to the Prefund Program (the "Received Fry Goods").

11

76. Thereafter, and upon request by Fry, CH 110 prefunded the sum of $128,329.31 to Fry pursuant to the Fry Contract (the "Fry Funds").

77. However, after CH 110 returned the Received Fry Goods to the manufacturer, the requests for reimbursement were rejected because the Received Fry Goods were not Returnable Goods.

78. The Fry Defendants submitted the Received Fry Goods to CH 110 knowing that they did not qualify as Returnable Goods and knowing that they would ultimately be rejected by the manufacturer.

79. On or about February 8, 2024, after CH 110's refund requests were denied by the manufacturer, CH 110 contacted the Fry Defendants to demand the return of the Fry Funds.

80. To date, the Fry Defendants have refused to repay CH 110 the Fry Funds.

<u>**COUNT ONE**</u>
**Breach of Contract – BP3**

81. CH 110 hereby restates each and every allegation set forth above as if fully restated herein.

82. The BP3 Contract constitutes a valid and enforceable agreement between CH 110 and BP3.

83. CH 110 fulfilled its obligations pursuant to the BP3 Contract.

84. BP3 has breached the BP3 Contract by, among other ways, delivering pharmaceutical products that do not qualify as Returnable Goods to CH 110, falsely representing that such products are Returnable Goods that are eligible for the Prefund Program, requesting and receiving the BP3 Refund Funds even though BP3 knew the products would be rejected by the manufacturer, and refusing to repay the BP3 Refund Funds to CH 110 despite knowing they are not entitled to them under the terms of the BP3 Contract.

12

85. As a direct and proximate cause of BP3's breaches of contract, CH 110 has suffered damages in excess of $341,829.87, with a final amount to be determined at trial.

## COUNT TWO
### Breach of Contract – BP3 Guaranty

86. CH 110 hereby restates each and every allegation set forth above as if fully restated herein.

87. In relation to the BP3 Contract between CH 110 and BP3, the BP3 Guarantor executed the BP3 Guaranty wherein the BP3 Guarantor agreed to, among other things, be responsible for any and all monies BP3 owed CH 110 in the event of a default or breach.

88. The BP3 Guaranty constitutes a valid and enforceable contract.

89. CH 110 fulfilled its obligations pursuant to the BP3 Guaranty.

90. The BP3 Guarantor has breached his BP3 Guaranty by, among other things, failing to repay monies BP3 owes CH 110 related to the BP3 Refund Funds.

91. As a direct and proximate cause of the BP3 Guarantor's breach of contract, CH 110 has suffered damages in excess of $341,829.87, with a final amount to be determined at trial.

## COUNT THREE
### Breach of Contract - HP

92. CH 110 hereby restates each and every allegation set forth above as if fully restated herein.

93. The HP Contract constitutes a valid and enforceable agreement between CH 110 and HP.

94. CH 110 fulfilled its obligations pursuant to the HP Contract.

95. HP has breached the HP Contract by, among other ways, delivering pharmaceutical products that do not qualify as Returnable Goods to CH 110, falsely representing that such products are Returnable Goods that are eligible for the Prefund Program, requesting and receiving the HP

Refund Funds even though HP knew the products would be rejected by the manufacturer(s), and refusing to repay the HP Refund Funds to CH 110 despite knowing they are not entitled to them under the terms of the HP Contract.

96.  As a direct and proximate cause of HP's breach of contract, CH 110 has suffered damages in excess of $298,338.19, with a final amount to be determined at trial.

## COUNT FOUR
### Breach of Contract – HP Guaranty

97.  CH 110 hereby restates each and every allegation set forth above as if fully restated herein.

98.  In relation to the HP Contract between CH 110 and HP, the HP Guarantor executed the HP Guaranty wherein the HP Guarantor agreed to, among other things, be responsible for any and all monies HP owed CH 110 in the event of a default or breach.

99.  The HP Guaranty constitutes a valid and enforceable contract.

100.  CH 110 fulfilled each and every one of its obligations pursuant to the HP Guaranty.

101.  The HP Guarantor has breached his HP Guaranty by, among other things, failing to repay monies HP owes CH 110 related to the HP Refund Funds.

102.  As a direct and proximate cause of the HP Guarantor's breach of contract, CH 110 has suffered damages in excess of $298,338.19, with a final amount to be determined at trial.

## COUNT FIVE
### Breach of Contract – BP4

103.  CH 110 hereby restates each and every allegation set forth above as if fully restated herein.

104.  The BP4 Contract constitutes a valid and enforceable agreement between CH 110 and BP4.

14

105.    CH 110 fulfilled its obligations pursuant to the BP4 Contract.

106.    BP4 has breached the BP4 Contract by, among other ways, delivering pharmaceutical products that do not qualify as Returnable Goods to CH 110, falsely representing that such products are Returnable Goods that are eligible for the Prefund Program, requesting and receiving the BP4 Refund Funds even though BP4 knew the products would be rejected by the manufacturer(s), and refusing to repay the BP4 Refund Funds to CH 110 despite knowing they are not entitled to them under the terms of the BP4 Contract.

107.    As a direct and proximate cause of BP4's breaches of contract, CH 110 has suffered damages in excess of $295,495.11, with a final amount to be determined at trial.

<div align="center">

**COUNT SIX**
**Breach of Contract – BP4 Guaranty**

</div>

108.    CH 110 hereby restates each and every allegation set forth above as if fully restated herein.

109.    In relation to the BP4 Contract between CH 110 and BP4, the BP4 Guarantor executed the BP4 Guaranty wherein the BP4 Guarantor agreed to, among other things, be responsible for any and all monies BP4 owed CH 110 in the event of a default or breach.

110.    The BP4 Guaranty constitutes a valid and enforceable contract.

111.    CH 110 fulfilled each and every one of its obligations pursuant to the BP4 Guaranty.

112.    The BP4 Guarantor has breached his BP4 Guaranty by, among other things, failing to repay monies BP4 owes CH 110 related to the BP4 Refund Funds.

113.    As a direct and proximate cause of the BP4 Guarantor's breach of contract, CH 110 has suffered damages in excess of $295,495.11, with a final amount to be determined at trial.

## COUNT SEVEN
### Breach of Contract – BP4 – Products

114.   CH 110 hereby restates each and every allegation, whether set forth above or below, as if fully restated herein.

115.   CH 110 and BP4 entered into the valid and enforceable BP4 Goods Contract.

116.   CH 110 fulfilled each and every one of its obligations pursuant to the BP4 Goods Contract.

117.   BP4 has breached the BP4 Goods Contract by, among other things, failing to pay CH 110 in full for the goods it ordered and received from CH 110.

118.   As a direct and proximate result of BP4's breaches CH 110 has suffered damages exceeding $16,123.00, with a final amount to be determined at trial.

## COUNT EIGHT
### Breach of Guaranty – BP4 Products

119.   CH 110 hereby restates each and every allegation, whether set forth above or below, as if fully restated herein.

120.   In relation to the BP4 Goods Contract between CH 110 and BP4, Talla executed a BP4 Goods Contract Guaranty wherein he agreed to, among other things, be responsible for any and all monies BP4 owed CH 110 in the event of a default/breach.

121.   The BP4 Goods Contract Guaranty is a valid and enforceable contract.

122.   CH 110 fulfilled each and every one of its obligations pursuant to the BP4 Goods Contract Guaranty.

123.   Talla has breached the BP4 Goods Contract Guaranty by, among other things, failing to repay monies BP4 owes CH 110 related to goods BP4 received.

124.   As a direct and proximate result of Talla's breaches CH 110 has suffered damages exceeding $16,123.00, with a final amount to be determined at trial.

16

## COUNT NINE
**Breach of Contract – BP2**

125.    CH 110 hereby restates each and every allegation, whether set forth above or below, as if fully restated herein.

126.    The BP2 Contract constitutes a valid and enforceable agreement between CH 110 and BP2.

127.    CH 110 fulfilled its obligations pursuant to the BP2 Contract.

128.    BP2 has breached the BP2 Contract by, among other ways, delivering pharmaceutical products that do not qualify as Returnable Goods to CH 110, falsely representing that such products are Returnable Goods that are eligible for the Prefund Program, requesting and receiving the BP2 Refund Funds even though BP2 knew the products would be rejected by the manufacturer(s), and refusing to repay the BP2 Refund Funds to CH 110 despite knowing they are not entitled to them under the terms of the BP2 Contract.

129.    As a direct and proximate result of BP2's breaches CH 110 has suffered damages exceeding $178,137.62, with a final amount to be determined at trial.

## COUNT TEN
**Breach of Contract – BP2 Guaranties**

130.    CH 110 hereby restates each and every allegation, whether set forth above or below, as if fully restated herein.

131.    In relation to the BP2 Contract between CH 110 and BP2, the BP2 Guarantors each executed the BP2 Guaranties wherein each BP2 Guarantor agreed to, among other things, be responsible for any and all monies BP2 owed CH 110 in the event of a default or breach.

132.    The BP2 Guaranties constitute valid and enforceable contracts.

133.    CH 110 fulfilled each and every one of its obligations pursuant to the BP2 Guaranties.

17

134.    Each BP2 Guarantor has breached their respective BP2 Guaranty by, among other things, failing to repay monies BP2 owes CH 110 related to the BP2 Refund Funds.

135.    As a direct and proximate result of BP2 Guarantor's breaches CH 110 has suffered damages exceeding $178,137.62, with a final amount to be determined at trial.

## COUNT ELEVEN
### Breach of Contract – Fry

136.    CH 110 hereby restates each and every allegation, whether set forth above or below, as if fully restated herein.

137.    The Fry Contract constitutes a valid and enforceable agreement between CH 110 and the Fry Defendants.

138.    CH 110 fulfilled its obligations pursuant to the Fry Contract.

139.    Fry has breached the Fry Contract by, among other ways, delivering pharmaceutical products that do not qualify as Returnable Goods to CH 110, falsely representing that such products are Returnable Goods that are eligible for the Prefund Program, requesting and receiving the Fry Refund Funds even though Fry knew the products would be rejected by the manufacturer, and refusing to repay the Fry Refund Funds to CH 110 despite knowing they are not entitled to them under the terms of the Fry Contract.

140.    As a direct and proximate cause of Fry's breaches of contract, CH 110 has suffered damages in excess of $128,329.31, with a final amount to be determined at trial.

## COUNT TWELVE
### Breach of Contract – Fry Guaranties

141.    CH 110 hereby restates each and every allegation, whether set forth above or below, as if fully restated herein.

142.    In relation to the Fry Contract between CH 110 and Fry, the Fry Guarantors each executed the Fry Guaranties wherein each Fry Guarantor agreed to, among other things, be

responsible for any and all monies Fry owed CH 110 in the event of a default or breach.

143.    The Fry Guaranties constitute valid and enforceable contracts.

144.    CH 110 fulfilled each and every one of its obligations pursuant to the Fry Guaranties.

145.    Each Fry Guarantor has breached their respective Fry Guaranty by, among other things, failing to repay monies Fry owes CH 110 related to the Fry Refund Funds.

146.    As a direct and proximate cause of the Fry Guarantor's breaches of contract, CH 110 has suffered damages in excess of $128,329.31, with a final amount to be determined at trial.

## COUNT THIRTEEN
### (Money Had and Received)

147.    Guarantors and Entity Defendants possess money that in equity in good conscience belongs to CH 110.

## CONDITIONS PRECEDENT

148.    All conditions precedent to recovery have occurred or been performed.

## PRAYER

**WHEREFORE**, Plaintiff Cardinal Health 110, LLC hereby requests that defendants be summoned to appear and answer and for entry of judgement awarding the following relief:

(i)    On Count One, judgment in CH 110's favor and against Defendant Brownsville Pharmacy #3, LLC and damages of at least $341,829.87, the exact amount of said damages to be determined at trial;

(ii)    On Count Two, judgment in CH 110's favor and against Defendant Srinivasa Talla and damages of at least $341,829.87, the exact amount of said damages to be determined at trial;

(iii)    On Count Three, judgment in CH 110's favor and against Defendant Harlingen Pharmacy, LLC and damages of at least $298,338.19, the exact amount of said damages to be determined at trial;

19

(iv) On <u>Count Four</u>, judgment in CH 110's favor and against Defendant Srinivasa Talla and damages of at least $298,338.19, the exact amount of said damages to be determined at trial;

(v) On <u>Count Five</u>, judgment in CH 110's favor and against Defendant Brownsville Pharmacy #4, LLC and damages of at least $295,495.11, the exact amount of said damages to be determined at trial;

(vi) On <u>Count Six</u>, judgment in CH 110's favor and against Defendant Srinivasa Talla and damages of at least $295,495.11, the exact amount of said damages to be determined at trial;

(vii) On <u>Count Seven</u>, judgment in CH 110's favor and against Defendant Brownsville Pharmacy # 4, LLC and damages of at least $16,123.00, the exact amount of said damages to be determined at trial;

(viii) On <u>Count Eight</u>, judgment in CH 110's favor and against Defendant Srinivasa Talla and damages of at least $16,123.00, the exact amount of said damages to be determined at trial;

(ix) On <u>Count Nine</u>, judgment in CH 110's favor and against Defendant Brownsville Pharmacy #2, LLC and damages of at least $178,137.62, the exact amount of said damages to be determined at trial;

(x) On <u>Count Ten</u>, judgment in CH 110's favor and against Defendants Srinivasa Talla and Srinivas Gadiraju, jointly and severally, and damages of at least $178,137.62, the exact amount of said damages to be determined at trial;

(xi) On <u>Count Eleven</u>, judgment in CH 110's favor and against Defendant Fry Pharmacy, LLC and damages of at least $128,329.31, the exact amount of said damages to be determined at trial;

(xii) On <u>Count Twelve</u>, judgment in CH 110's favor and against Defendants Srinivasa Talla and Srinivas Gadiraju, jointly and severally, and damages of at least $128,329.31, the exact amount of said damages to be determined at trial;

(xiii) Attorney's fees and costs pursuant to the contracts and guaranties noted herein and pursuant to Chapter 38 of the Texas Civil Practice and Remedies Code;

(xiv) Pre- and post-judgment interest at the highest rates allowed;

(xv) Taxable costs; and

(xvi) Any additional relief the Court deems just and equitable.

Respectfully submitted,

*/s/ Kevin Pennell*

Kevin Pennell (TBN 24046607)
Fed ID No 583414
Pennell Law Firm PLLC
19 Briar Hollow Ln ste 110
Houston TX 77027
713-965-7568
713-583-9455 (fax)
kevin@pennellfirm.com
**ATTORNEY FOR PLAINTIFF**

R. Scott Heasley (OH #0087235)
Hilary F. DeSaussure (OH #0098989)
BRENNAN, MANNA & DIAMOND, LLC
75 E. Market Street
Akron, Ohio 44308
Phone / Fax: (216) 428-4718
Email: rsheasley@bmdllc.com
　　　　hfdesaussure@bmdllc.com

**ATTORNEY FOR PLAINTIFFS**
*(Pro Hac Vice Forthcoming)*

## DEMAND FOR JURY TRIAL

Pursuant to Fed. R. Civ. P. Rule 38(b), Plaintiff Cardinal Health 110, LLC hereby demands a trial by jury for any and all issues triable of right by a jury.

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of the foregoing instrument was served upon all counsel of record on this 18th day of March 2026, by CM/ECF.

*/s/ Kevin Pennell*

21



**Cardinal**Health

Credit Application

Updated 7/1/2014

## Section I – GENERAL INFORMATION

1. Legal Entity Name: _BROWNSVILLE PHARMACY 3, LLC_
2. D/B/A (if any): _AUTREY PHARMACY 3_
3. Business Type (check one):
   Proprietorship _____ Partnership _____ (S) Corp _____ (C) Corp _____ LLC _X_ Other _____
4. Legal Entity Business Address: _____

   Business Phone #:_____ Business Fax #: _____

   Shipping Address (if different from business address): _800 E. ALTON GLOOR BLVD UNIT B, BROWNSVILLE TX 78526_

   Billing Address (If different from business address): _____

5. Billing Contact name: __Srinivasa Talla_____ Contact Phone # _845-392-8254_____

   Billing Contact e-mail address: _stalla@hotmail.com_____

6. Primary Business Contact: _Srinivasa Talla Rph._Owner_____845-392-8254__stalla@hotmail.com__
                                 Name         Title        Phone #     Email Address

## Section II – FINANCIAL INFORMATION

7. Federal Tax ID #: ▮▮▮▮▮▮▮▮▮▮ _____

   State Tax ID #: ▮▮▮▮▮▮▮▮ his number must correspond with sales tax exemption certificate).

   State of Incorporation _TEXAS_

8. List Any Businesses Affiliated with Legal Entity on Line #1 (Include Addresses & Account #'s):

   _Autrey Pharmacy 1 1205 central blvd. Brownsville Tx. 78520 Acc# ▮▮▮▮▮ _____

   _Autrey Pharmacy 2 1365 E ruben Torres Blvd. Brownsville, Tx. 78521 Acc# ▮▮▮▮▮ _____

9. List Name of Proprietor, Partners, or Officers of Legal Entity:

| _Srinivasa Talla | Rph_____ | 70% | 406 Vassar Pl. Fishkill, NY. 12524____ |
| Name | Title | %owned | Home Address |
| _Ravidra Shah | PharmD. | 30% | 5901 Diamondback Brownsville, Tx. 78526_____ |
| Name | Title | %owned | Home Address |
| _____ | | | |
| Name | Title | %owned | Home Address |

**EXHIBIT**

tabbies

1

10. List Names and addresses of other health care companies in which any of the individuals or organizations listed in Question #9 above also have an ownership interest (i.e. owner, partner or officer):

Name of Individual/Company     Name of Affiliated Company     Address of Affiliated Company

Name of Individual/Company     Name of Affiliated Company     Address of Affiliated Company

Name of Individual/Company     Name of Affiliated Company     Address of Affiliated Company

11. How Long has Business been under present ownership: __ Year Started 2015___ # of employees _2_

12. Estimated Monthly Purchases ____    Estimated Initial Purchase (if above avg.) _____

Terms Requested (subject to credit approval) _____

13. Major Suppliers/Existing Wholesalers:

Supplier    Address    Phone #    Contact    Account # / $ High Cr. Amt. / $ Amt. Owed

Supplier    Address    Phone #    Contact    Account # / $ High Cr. Amt. / $ Amt. Owed

14. Name of Bank:

Bank      Account #      Address      Phone #

15. Will Goods Purchased Be Resold? Yes ___ No _X__

If yes, in what form? AS IS ___ Re-Manufactured ___ Re-Packaged ___ Internationally ___ Other _____

Will Pharmaceuticals Be Sold to Anyone other than a Patient? Yes ___ No _X__

If Yes, Please Explain _____

Drug License Type*    Physician ___ Wholesaler ___ Pharmacy _X__ Precursor ___ DEA _x__ Other _____

*Must provide a copy of your state-issued license and DEA Permit DEA # TX. Lic# 29681 _FA5030010_____

**State-issued license must be provided to purchase medical supplies containing a Rx- only label. Applicant will be unable to purchase these types of medical supplies without a state-issued license.**

16. Are there currently any suits, liens, or judgments filed against applicant or its business, and/or has applicant or its business ever filed for bankruptcy? Yes __ No _X_
If yes, please describe _____

17. Type of Business of Applicant:

_____ Acute      _____ Primary Care      _____ Specialty      _____ Home Health

_____ Extended   _____ Long Term      __X__ Pharmacy         _____ Closed Door

_____ Internet   _____ Mail Order      _____ Supplier        _____ Government

_____ Surgery Center   _____ Laboratory      _____ Distributor/Wholesaler

_____ Other _____

## Section III--Agreement

1. As an inducement for Cardinal Health* to accept orders from or otherwise extend or make available credit to Applicant, the undersigned Applicant hereby agrees to comply with the following terms of sale, should Cardinal Health elect to extend such credit.

2. The Applicant acknowledges and agrees that it does not and will not redistribute any product distributed by Cardinal Health to the secondary market, including but not limited to, (i) pharmaceutical product purchased from Cardinal Health; and/or (ii) Cardinal Health self-manufactured products.

3. Until the Product is paid for in full, Cardinal Health retains, and the Applicant hereby grants a security interest to Cardinal Health in the product Cardinal Health has sold or is selling to Applicant (the "Product").

4. All payments shall be made in full, in accordance with the payment terms, via ACH direct debit or other payment forms acceptable to Cardinal Health. Cardinal Health may assess a service charge calculated at the rate of 1.5% per month (or the maximum rate allowed by law, if such rate is less than 1.5% per month) on any amount not paid by Applicant to Cardinal Health when due under the terms of this Agreement. Failure or delay by Cardinal Health to bill Applicant for any such service charge will not waive Cardinal Health's right to receive the same. In the event of default in payments on any invoices, Cardinal Health shall have the right to declare all invoices immediately due and payable. Applicant shall pay all out-of-pocket expenses, including attorneys' fees and costs, incurred by Cardinal Health to collect any amounts due under this Agreement or to otherwise enforce any of the terms of this Agreement.

5. Applicant attests to Cardinal Health that it or the pharmacist(s) employed and/or affiliated with Applicant are properly licensed with applicable state licensing agencies to receive, dispense, distribute and otherwise legally dispose of the Product. Applicant understands that by attesting to this, Cardinal Health is complying with the "good faith inquiry" standard to ensure that the Product is distributed to properly licensed and/or registered pharmacy locations. Prior to purchasing the Product from Cardinal Health hereunder, Applicant must provide Cardinal Health with copies of all such licenses and any renewals, revocations or other changes to the same.

6. Applicant agrees that Product will be purchased under Cardinal Health's standard terms and conditions as in effect from time to time and/or the terms and conditions set forth in a vendor agreement between Applicant and Cardinal Health (the standard terms and conditions and the vendor agreement shall hereinafter be collectively referred to as the "Terms and Conditions"). The Terms and Conditions are hereby incorporated by reference and made a part hereof. Applicant acknowledges that the Terms and Conditions may be amended or modified by Cardinal Health from time to time and agrees to be bound by such modifications and/or amendments.

7. Without limiting Cardinal Health's rights under law or in equity, Cardinal Health (including its affiliates, subsidiaries, parent or related entities, collectively or individually), may exercise a right of set-off against any and all amounts due Applicant. For purposes of this Section 7, Cardinal Health shall be deemed to be a single creditor.

8. This Agreement, and any purchase orders, and all exhibits and addenda thereto constitute the entire agreement and understanding of the parties with respect to the subject matter hereof and supersede all prior written and oral agreements, proposals, bid responses, and understandings between the parties relative to the subject matter hereof. Except as otherwise

provided herein, no changes to this Agreement or any purchase order will be made or be binding upon either party unless made in writing and signed by each party; provided, however, that Cardinal Health may increase, decrease, revoke or limit the amount and terms of credit extended to Applicant. No course of prior dealings between the Applicant and Cardinal Health and no usage of trade shall be relevant or admissible to supplement, to explain, or vary any of the terms of this Agreement.

9. All Applicable taxes including Federal Excise Tax will be collected as part of the sale.

10. All information provided in this Application or otherwise submitted is true and correct and is being (or will be) furnished for the purpose of obtaining/retaining credit from Cardinal Health. Applicant shall provide Cardinal Health with financial statements and such further information as may reasonably be requested by Cardinal Health from time to time. Applicant authorizes Cardinal Health to verify this information and/or additional information by obtaining data from a credit reporting agency. Applicant acknowledges and agrees to the sharing of financial statements and other information between and among Cardinal Health's subsidiaries and affiliates. Applicant authorizes Cardinal Health to request, obtain and share information with other creditors of Applicant. Applicant shall also provide to Cardinal Health advanced written notice of a proposed change in twenty-five (25%) or more of the ownership or control of Applicant's business or assets. Applicant authorizes Cardinal Health to rely on the accuracy of all information provided herein unless and until any information is changed by Applicant's written notice to Cardinal Health.

11. In order to secure timely and full payment and performance of all present and future obligations of Applicant to Cardinal Health (the "Obligations"), including but not limited to all promissory notes and sales on credit, Applicant hereby grants to Cardinal Health a security interest in all of following business assets of Applicant, wherever located and whether now owned or hereafter acquired: all goods, equipment, inventory, accounts, accounts receivable, chattel paper, instruments, investment property and all general intangibles, books and records, computer programs and records, and other personal property, tangible or intangible, related to any of the foregoing (including, without limitation, all prescription files, patient lists, signs, appliances, cash registers, computers, computer software, shelving, check-out counters, compressors, freezers, coolers, display cases, customer records, sundries, tobacco products, prescription and over-the-counter pharmaceutical products, health and beauty aids, home healthcare products and general merchandise and supplies); all accessions and additions to, substitutions for, and replacements of any of the foregoing; all proceeds or products of any of the foregoing; and all rights to payments under any insurance or warranty, guaranty, or indemnity payable with respect to any of the foregoing (collectively, the "Collateral"). All items of Collateral shall remain personal property and shall not become part of any real estate regardless of the manner of affixation. This security interest shall continue in effect until Cardinal Health is indefeasibly paid in full.

12. Applicant authorizes Cardinal Health to initiate debit entries from Applicant's account indicated below and Applicant authorizes the financial institution named below (the "Institution") to debit the same such account. Authority to initiate debit entries shall remain in full force and effect until Cardinal Health and the Institution have received written notice from the Applicant of its termination of such authorization. Applicant acknowledges that it has the legal right to stop payment of a debit entry by notification to the Institution; provided, prior to such notification, Applicant shall provide sufficient written notice to permit Cardinal Health to take any actions it deems necessary to avoid disruption in payments from the Applicant.

Bank Name: _JP morgan Chase._

Bank Transit ABA#: █████████

Bank Account #: █████████

13. The Authorized Signatory represents that he/she has the authority to bind Applicant to this Agreement. The Applicant acknowledges and agrees that this is an application for business credit and the transactions contemplated are not for primarily personal, family or household purposes. Recognizing that the owner's/partner's/shareholder's/managing member's credit history may be a factor in the evaluation of Applicant's credit history, the owner(s) / partners / shareholder(s) / managing member hereby consent to the use of a consumer credit report by Cardinal Health as it may deem necessary in the credit evaluation process and for periodic review for the purpose of maintaining the credit relationship.

14. Whenever possible, each provision of this Agreement shall be interpreted in such a manner as to be effective and valid under applicable laws; but, if any provision of this Agreement shall be prohibited by or invalid under applicable law, such provision shall be ineffective to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of the Agreement.

15. Any action(s) to enforce the terms of this Agreement may be brought in any court of competent jurisdiction selected by Cardinal Health. This Agreement will be governed by and construed in accordance with the laws of the State of Ohio, without regard to conflict-of-laws principles, (and specifically excluding the provisions of the United Nations Convention on the International Sale of Goods.)

16  The Applicant and Cardinal Health agree that the use of electronic transmission, including, but not limited to, e-mail or other transmissions via the Internet or World Wide Web, in entering into and in exercising their rights and performing their obligations under this Agreement is in the best interests of all of the parties and shall be permissible, notwithstanding any requirement of the Uniform Commercial Code or any other applicable law that might otherwise be considered unsatisfied as a result of the utilization of such media.  The Applicant and Cardinal Health therefore agree that the Uniform Electronic Transactions Act, as promulgated by the National Conference of Commissions on Uniform State Laws, shall be applicable to the construction of this Agreement and any transactions hereunder, whether or not such Act shall have been adopted in any jurisdiction.  By way of illustration and not of limitation, the Applicant and Cardinal Health agree to the following:

   (a)    any document (including this Agreement) transmitted by electronic transmission shall be treated in all respects as an original signed document;

   (b)    the signature (including an electronic signature) of any Party shall be considered for these purposes as an original signature;

   (c)    any such electronic transmission shall be considered to have the same binding legal effect as an original document; and

   (d)    neither Party shall raise the use of electronic transmission as a defense to this Agreement or in matters relating to any transaction pursuant to this Agreement, and each Party waives such defense.

17.  If this application for business credit is denied, Applicant has the right to a written statement of the specific reasons for the denial. Cardinal Health will send Applicant a written statement of the specific reason(s) for the denial within thirty (30) days of receiving a request for a written statement.  The Federal Equal Credit Opportunity Act and similar state laws prohibit creditors from discriminating against credit applicant on the basis of race, color, religion, national origin, sex, sexual orientation, marital status, familial status, age (provided the applicant has the capacity to enter into a binding contract), handicapping condition of the applicant; because all or part of the applicant's income derives from any public assistance program; or because the applicant has in good faith exercised any right under the Consumer Credit Protection Act. The federal agency that administers compliance with this law is the Federal Trade Commission, Equal Credit Opportunity, Washington, D.C. 20580.


_Brownsville Pharmacy 3 LLC_____
Printed Legal Entity Name of Applicant as it appears in Section I of the Application

BY: _____
      Authorized Signature

ITS: ___Managing Member_____
       Authorized Signatory Title

_Srinivasa Talla_____
Printed Name of Signatory

Date: _03/02/15_


**Section IV – Guaranty**

Each undersigned principal of Applicant (as defined above), by reason of his/her financial interest in Applicant and as an inducement of Cardinal Health to extent credit to Applicant, and intending to be legally bound, hereby jointly and severally, irrevocably and unconditionally guaranty to Cardinal Health, and its subsidiaries, affiliates and successors (each a "Guaranty Party") the prompt and full payment (and not merely the ultimate collection) and performance of all Obligations (as defined above) to Cardinal Health, whether now existing or hereafter arising, including any payment made to Cardinal Health that is subsequently avoided in bankruptcy or recovered from Cardinal Health for any reason. Each Guaranty Party authorizes Cardinal Health to verify this information and/or additional information by obtaining data from a credit reporting agency. This is a continuing guaranty and the obligations of each Guaranty Party may not be revoked or limited so long as Cardinal Health continues to extend credit to Applicant and/or its successors and assigns. Likewise, the obligations of each Guaranty Party may not be revoked or limited, regardless of renewals, extensions or modifications of trade terms or credit limits granted to Applicant by Cardinal Health. Each Guaranty Party's obligations under this Guaranty are independent of and separate from the obligations of Applicant. This Guaranty shall be governed under the laws of the State of Ohio. Any action(s) to enforce the terms of this Guaranty may be brought in any court of competent jurisdiction selected by Cardinal Health.

**EACH GUARANTY PARTY ACKNOWLEDGES THAT HIS/HER INDIVIDUAL CREDIT HISTORY MAY BE A FACTOR IN THE EVALUATION OF THE CREDIT HISTORY OF THE APPLICANT AND HEREBY CONSENTS AND AUTHORIZES THE USE OF A CONSUMER CREDIT REPORT ON THE UNDERSIGNED BY CARDINAL HEALTH FROM TIME TO TIME AS CARDINAL HEALTH MAY DEEM NECESSARY IN ITS CREDIT EVALUATIONS.**

| | | |
|---|---|---|
| Signature | Signature | Signature |
| Srinivasa Talla | | |
| Printed Name | Printed Name | Printed Name |
| Social Security █████████ | Social Security #___ | Social Security #___ |
| Address: _406 Vassar Pl. Fishkill NY. 12524____ | Address: ____ | Address: ____ |
| Telephone #: _845-392-8254___ | Telephone #: __ | Telephone #: ____ |
| Date: _03/02/15_ | Date: ____ | Date: ____ |

*The term "Cardinal Health" shall mean collectively all subsidiaries, related and affiliated companies of Cardinal Health, Inc. ("CHI"), an Ohio corporation, and successors and assigns thereof, whether existing now or in the future, including but not limited to Parmed Pharmaceuticals, LLC.



**Cardinal**Health

Credit Application

Updated: 12/8/2018

## Section I – GENERAL INFORMATION

1. Legal Entity Name: __HARLINGEN PHARMACY LLC.__
2. D/B/A (if any): _____
3. Business Type (check one):
   Proprietorship ▨  Partnership ▨  (S) Corp ▨  (C) Corp ▨  LLC ▨  Other ▨
4. Legal Entity Business Address: __1616 ED CAREY DR.   HARLINGEN TX 78551__

   Shipping Address (if different from business address): _____

   Billing Address (if different from business address): _____

5. Billing Contact name: __SRI TALLA__ Contact Phone # __845 392 8254__

   Billing Contact e-mail address: __STALLA@HOTMAIL.COM__

6. Primary Business Contact: __MOBEEN AHMED   845 2837474__
   | Name | Title | Phone # | Email Address |
   
   MANAGER   AUTREYPharmacy@GMAIL.COM

## Section II – FINANCIAL INFORMATION

7. Federal Tax ID #: ▓▓▓▓▓▓

   State Tax ID #: _____ (This number must correspond with sales tax exemption certificate).

   State of Incorporation __TX__

8. List Any Businesses Affiliated with Legal Entity on Line #1 (Include Addresses & Account #'s):

   _____

   _____

9. List Name of Proprietor, Partners, or Officers of Legal Entity:

   __SRINIVASA TALLA__      __100 %.__      __406 VASSAR PL  FISHKILL NY 12524__
   | Name | Title | %owned | Home Address |
   
   MEMBER

   | Name | Title | %owned | Home Address |

   | Name | Title | %owned | Home Address |



EXHIBIT

2

10. List Names and addresses of other health care companies in which any of the individuals or organizations listed in Question #9 above also have an ownership interest (i.e. owner, partner or officer):

| Name of Individual/Company | Name of Affiliated Company | Address of Affiliated Company |
| --- | --- | --- |
| Name of Individual/Company | Name of Affiliated Company | Address of Affiliated Company |
| Name of Individual/Company | Name of Affiliated Company | Address of Affiliated Company |

11. How Long has Business been under present ownership: _____ Year Started _____ # of employees _____

12. Estimated Monthly Purchases __100,000__ Estimated Initial Purchase (if above avg.) _____

Terms Requested (subject to credit approval) __SAME AS BROWNSVILLE PHARMACY 1__

13. Major Suppliers/Existing Wholesalers:

__CARDINAL__

| Supplier | Address | Phone # | Contact | Account # / $ High Cr. Amt. / $ Amt. Owed |
| --- | --- | --- | --- | --- |
| Supplier | Address | Phone # | Contact | Account # / $ High Cr. Amt. / $ Amt. Owed |

14. Name of Bank:

__CHASE__ ▉▉▉▉ __MAIN ST__ FISHKILL NY 12524

| Bank | Account # | Address | Phone # 845 897 393 |
| --- | --- | --- | --- |

15. Are there currently any suits, liens, or judgments filed against applicant or its business, and/or has applicant or its business ever filed for bankruptcy? Yes _____ No X .
If yes, please describe _____

16. Type of Business of Applicant:

| _____ Acute | _____ Primary Care | _____ Specialty | _____ Home Health |
| --- | --- | --- | --- |
| _____ Extended | _____ Long Term | X Pharmacy | _____ Closed Door |
| _____ Internet | _____ Mail Order | _____ Supplier | _____ Government |
| _____ Other _____ | | | |

## Section III--Agreement

1.  As an inducement for Cardinal Health* to accept orders from or otherwise extend or make available credit to Applicant, the undersigned Applicant hereby agrees to comply with the following terms of sale, should Cardinal Health elect to extend such credit.

2.  The Applicant acknowledges and agrees that it does not and will not redistribute any product distributed by Cardinal Health to the secondary market, including but not limited to, (i) pharmaceutical product purchased from Cardinal Health; and/or (ii) Cardinal Health self-manufactured products.

3.  Until the Product is paid for in full, Cardinal Health retains, and the Applicant hereby grants a security interest to Cardinal Health in the product Cardinal Health has sold or is selling to Applicant (the "Product").

4.  All payments shall be made in full, in accordance with the payment terms, via ACH direct debit or other payment forms acceptable to Cardinal Health. Cardinal Health may assess a service charge calculated at the rate of 1.5% per month (or the maximum rate allowed by law, if such rate is less than 1.5% per month) on any amount not paid by Applicant to Cardinal Health when due under the terms of this Agreement. Failure or delay by Cardinal Health to bill Applicant for any such service charge will not waive Cardinal Health's right to receive the same. In the event of default in payments on any invoices, Cardinal Health shall have the right to declare all invoices immediately due and payable. Applicant shall pay all out-of-pocket expenses, including attorneys' fees and costs, incurred by Cardinal Health to collect any amounts due under this Agreement or to otherwise enforce any of the terms of this Agreement.

5.  Applicant attests to Cardinal Health that it or the pharmacist(s) employed and/or affiliated with Applicant are properly licensed with applicable state licensing agencies to receive, dispense, distribute and otherwise legally dispose of the Product. Applicant understands that by attesting to this, Cardinal Health is complying with the "good faith inquiry" standard to ensure that the Product is distributed to properly licensed and/or registered pharmacy locations. Prior to purchasing the Product from Cardinal Health hereunder, Applicant must provide Cardinal Health with copies of all such licenses and any renewals, revocations or other changes to the same.

6.  Applicant agrees that Product will be purchased under Cardinal Health's standard terms and conditions as in effect from time to time and/or the terms and conditions set forth in a vendor agreement between Applicant and Cardinal Health (the standard terms and conditions and the vendor agreement shall hereinafter be collectively referred to as the "Terms and Conditions"). The Terms and Conditions are hereby incorporated by reference and made a part hereof. Applicant acknowledges that the Terms and Conditions may be amended or modified by Cardinal Health from time to time and agrees to be bound by such modifications and/or amendments.

7.  Without limiting Cardinal Health's rights under law or in equity, Cardinal Health (including its affiliates, subsidiaries, parent or related entities, collectively or individually), may exercise a right of set-off against any and all amounts due Applicant. For purposes of this Section 7, Cardinal Health shall be deemed to be a single creditor.

8.  This Agreement, and any purchase orders, and all exhibits and addenda thereto constitute the entire agreement and understanding of the parties with respect to the subject matter hereof and supersede all prior written and oral agreements, proposals, bid responses, and understandings between the parties relative to the subject matter hereof. Except as otherwise provided herein, no changes to this Agreement or any purchase order will be made or be binding upon either party unless made in writing and signed by each party; provided, however, that Cardinal Health may increase, decrease, revoke or limit the amount and terms of credit extended to Applicant.

9.  All Applicable taxes including Federal Excise Tax will be collected as part of the sale.

10. All information provided in this Application or otherwise submitted is true and correct and is being (or will be) furnished for the purpose of obtaining/retaining credit from Cardinal Health. Applicant shall provide Cardinal Health with financial statements and such further information as may reasonably be requested by Cardinal Health from time to time. Applicant authorizes Cardinal Health to verify this information and/or additional information by obtaining data from a credit reporting agency. Applicant acknowledges and agrees to the sharing of financial statements and other information between and among Cardinal Health's subsidiaries and affiliates. Applicant authorizes Cardinal Health to request, obtain and share information with other creditors of Applicant. Applicant shall also provide to Cardinal Health advanced written notice of a proposed change in twenty-five (25%) or more of the ownership or control of Applicant's business or assets. Applicant authorizes Cardinal Health to rely on the accuracy of all information provided herein unless and until any information is changed by Applicant's written notice to Cardinal Health.

11. In order to secure timely and full payment and performance of all present and future obligations of Applicant to Cardinal Health (the "Obligations"), including but not limited to all promissory notes and sales on credit, Applicant hereby grants to Cardinal Health a security interest in all of following business assets of Applicant, wherever located and whether now owned or hereafter acquired; all goods, equipment, inventory, accounts, accounts receivable, chattel paper, instruments, investment property and all general intangibles, books and records, computer programs and records, and other personal property, tangible or intangible, related to any of the foregoing (including, without limitation, all prescription files, patient lists, signs, appliances, cash registers, computers, computer software, shelving, check-out counters, compressors, freezers, coolers, display cases, customer records, sundries, tobacco products, prescription and over-the-counter pharmaceutical products, health and beauty aids, home healthcare products and general merchandise and supplies); all accessions and additions to, substitutions for, and replacements of any of the foregoing; all proceeds or products of any of the foregoing; and all rights to payments under any insurance or warranty, guaranty, or indemnity payable with respect to any of the foregoing (collectively, the "Collateral"). All items of Collateral shall remain personal property and shall not become part of any real estate regardless of the manner of affixation. This security interest shall continue in effect until Cardinal Health is indefeasibly paid in full.

12. Applicant authorizes Cardinal Health to initiate debit entries from Applicant's account indicated below and Applicant authorizes the financial institution named below (the "Institution") to debit the same such account. Authority to initiate debit entries shall remain in full force and effect until Cardinal Health and the Institution have received written notice from the Applicant of its termination of such authorization. Applicant acknowledges that it has the legal right to stop payment of a debit entry by notification to the Institution; provided, prior to such notification, Applicant shall provide sufficient written notice to permit Cardinal Health to take any actions it deems necessary to avoid disruption in payments from the Applicant.

Bank Name: ___CHASE.___

Bank Transit ABA#: _____

Bank Account #: _____

13. The Authorized Signatory represents that he/she has the authority to bind Applicant to this Agreement. The Applicant acknowledges and agrees that this is an application for business credit and the transactions contemplated are not for primarily personal, family or household purposes. Recognizing that the owner's/partner's/shareholder's/managing member's credit history may be a factor in the evaluation of Applicant's credit history, the owner(s) / partners / shareholder(s) / managing member hereby consent to the use of a consumer credit report by Cardinal Health as it may deem necessary in the credit evaluation process and for periodic review for the purpose of maintaining the credit relationship.

14. Any action(s) to enforce the terms of this Agreement may be brought in any court of competent jurisdiction selected by Cardinal Health.

15. If this application for business credit is denied, Applicant has the right to a written statement of the specific reasons for the denial. Cardinal Health will send Applicant a written statement of the specific reason(s) for the denial within thirty (30) days of receiving a request for a written statement. The Federal Equal Credit Opportunity Act and similar state laws prohibit creditors from discriminating against credit applicant on the basis of race, color, religion, national origin, sex, sexual orientation, marital status, familial status, age (provided the applicant has the capacity to enter into a binding contract), handicapping condition of the applicant; because all or part of the applicant's income derives from any public assistance program; or because the applicant has in good faith exercised any right under the Consumer Credit Protection Act. The federal agency that administers compliance with this law is the Federal Trade Commission, Equal Credit Opportunity, Washington, D.C. 20580.

@ HARLINGEN PHARMACY LLC.

Printed Legal Entity Name of Applicant as it appears in Section I of the Application

BY: _Srinivas M Talla_

ITS: _MANAGING MEMBER_
Authorized Signatory Title

_SRINIVASA R TALLA_
Printed Name of Signatory

Date: ___03/17/14.___

## Section IV - Guaranty

Each undersigned principal of Applicant (as defined above), by reason of his/her financial interest in Applicant and as an inducement of Cardinal Health to extent credit to Applicant, and intending to be legally bound, hereby jointly and severally, irrevocably and unconditionally guaranty to Cardinal Health, and its subsidiaries, affiliates and successors (each a "Guaranty Party") the prompt and full payment (and not merely the ultimate collection) and performance of all Obligations (as defined above) to Cardinal Health, whether now existing or hereafter arising, including any payment made to Cardinal Health that is subsequently avoided in bankruptcy or recovered from Cardinal Health for any reason. Each Guaranty Party authorizes Cardinal Health to verify this information and/or additional information by obtaining data from a credit reporting agency. This is a continuing guaranty and the obligations of each Guaranty Party may not be revoked or limited so long as Cardinal Health continues to extend credit to Applicant and/or its successors and assigns. Each Guaranty Party's obligations under this Guaranty are independent of and separate from the obligations of Applicant. This Guaranty shall be governed under the laws of the State of Ohio. Any action(s) to enforce the terms of this Guaranty may be brought in any court of competent jurisdiction selected by Cardinal Health.

EACH GUARANTY PARTY ACKNOWLEDGES THAT HIS/HER INDIVIDUAL CREDIT HISTORY MAY BE A FACTOR IN THE EVALUATION OF THE CREDIT HISTORY OF THE APPLICANT AND HEREBY CONSENTS AND AUTHORIZES THE USE OF A CONSUMER CREDIT REPORT ON THE UNDERSIGNED BY CARDINAL HEALTH FROM TIME TO TIME AS CARDINAL HEALTH MAY DEEM NECESSARY IN ITS CREDIT EVALUATIONS.

| Signature | Signature | Signature |
|---|---|---|
| SRINIVASA TALLA | | |
| Printed Name | Printed Name | Printed Name |
| Social Security # ▮▮▮▮▮ | Security # | Social Security # |
| Address: 904 VASSAR PL | Address: | Address: |
| FISHKILL NY 12524 | | |
| Telephone #: 845 392 8254 | Telephone #: | Telephone #: |
| Date: 03/17/14 | Date: | Date: |

*The term "Cardinal Health" shall mean collectively all subsidiaries, related and affiliate companies of Cardinal Health, Inc. ("CHI"), an Ohio corporation, and successors and assigns thereof, whether existing now or in the future, including but not limited to Parmed Pharmaceuticals, Inc.


CardinalHealth

## Credit Application

Updated: 6/23/2016

**Section I  GENERAL INFORMATION**

1. Legal Entity Name: Brownsville Pharmacy 4 LLC

2. D/B/A (if any): Autrey Pharmacy 4

3. Business Type (check one): Proprietorship ____ Partnership ____ (S) Corp ____ (C) Corp ____ LLC ✓ Other ____

4. Legal Entity Business Address: 3503 Boca Chica Blvd. Brownsville, TX 78521

Business Phone #: _____  Business Fax #: _____

Shipping Address (if different from business address): _____

Billing Address (if different from business address): _____

5. Billing Contact name: Sri Talla _____  Contact Phone # _____

Billing Contact e-mail address: Stalla@hotmail.com

6. Primary Business Contact: Sri Talla    managing member    Stalla@gmail.com
   Name          Title          Phone #    Email Address

**Section II  FINANCIAL INFORMATION**

7. Federal Tax ID #: ███████

State Tax ID #: _____ (This number must correspond with sales tax exemption certificate).

State of Incorporation ___ TX ___    HIN (Health Industry Number) _____

8. List any businesses affiliated with legal entity on line #1 (include addresses & account #'s):

Autrey Pharmacy 1, LLC    1205 Central Blvd Brownsville TX.

Autrey Pharmacy 2, LLC    1345 Ruben Torres SR Blvd Brownsville TX

9. List name of proprietor, partners, or officers of legal entity

Srinivasa Talla    managing member    100%    15 Oak lane Green Brook, NJ 08812
Name          Title          %owned    Home Address

_____    _____    _____    _____
Name          Title          %owned    Home Address

_____    _____    _____    _____
Name          Title          %owned    Home Address

**EXHIBIT**
**3**

10. List names and addresses of other health care companies in which any of the individuals or organizations listed in question #9 above also have an ownership interest (i.e. owner, partner or officer):

_Sinuask Trica_    _Curley Pharmacy_ 1    _1205 Central Bld Brownville_

Name of Individual     Company Name of Affiliated     Company Address of Affiliated Company

        _Curley Pharmacy_ 2

                                   _1265 Ruben Torres Sr Blvd Brownville_

Name of Individual     Company Name of Affiliated     Company Address of Affiliated Company

Name of Individual     Company Name of Affiliated     Company Address of Affiliated Company

11. How long has business been under present ownership: _New Business_ Year Started _____ # of employees _____

12. Estimated Monthly Purchases _____ Estimated Initial Purchase (if above avg.) _____

Terms Requested (subject to credit approval) _____

13. Major Suppliers/Existing Wholesalers:

| Supplier | Address | Phone # | Contact Account # | $ High Cr. Amt. & Amt. Owed |
|---|---|---|---|---|
| Supplier | Address | Phone # | Contact Account # | $ High Cr. Amt. & Amt. Owed |

14. Name of Bank:

_Chase Bank_

| Bank | Account # | Address | | Phone # |
|---|---|---|---|---|
| Bank | Account # | (Gov't Receivables) | Address | Phone # |

15. Will goods purchased be resold? Yes ✓ No _____
If yes, in what form? AS IS ✓ Re-Manufactured _____ Re-Packaged _____ Internationally _____ Other _____
Will pharmaceuticals be sold to anyone other than a patient? Yes _____ No ✓
If yes, please explain _____

Drug License Type*   Physician ___ Wholesaler ___ Pharmacy ✓ Precursor ___ DEA ✓ Other ___

16. Are there currently any suits, liens, or judgments filed against applicant or its business, and/or has applicant or its business ever filed for bankruptcy? Yes _____ No ✓
If yes, please describe _____

17. Type of Business of Applicant:

_____ Acute         _____ Primary Care       _____ Specialty        _____ Home Health
_____ Extended     _____ Long Term        ✓ Pharmacy       _____ Closed Door
_____ Internet      _____ Mail Order       _____ Supplier        _____ Government
_____ Surgery Center   _____ Laboratory      _____ Distributor / Wholesaler
_____ Other _____

## Section III - AGREEMENT

1. As an inducement for Cardinal Health to accept orders from or otherwise extend or make available credit to Applicant, the undersigned Applicant hereby agrees to comply with the following terms of sale, should Cardinal Health elect to extend such credit. "Cardinal Health" means, collectively, whether one or more, each subsidiary and Affiliate of Cardinal Health, Inc., an Ohio corporation, whether existing now existing or created in the future, together with the successors and assigns of any such entity.

2. The Applicant acknowledges and agrees that it does not and will not redistribute any product distributed by Cardinal Health to the secondary market, including but not limited to (i) pharmaceutical product purchased from Cardinal Health, and (ii) Cardinal Health self-manufactured products.

3. Until the Product is paid for in full, Cardinal Health retains, and the Applicant hereby grants a security interest to Cardinal Health in the product Cardinal Health has sold or is selling to Applicant, together with all proceeds thereof (the "Product").

4. All payments shall be made in full, in accordance with the payment terms, via ACH direct debit or other payment forms acceptable to Cardinal Health. Cardinal Health may assess a service charge calculated at the rate of 1.5% per month (or the maximum rate allowed by law, if such rate is less than 1.5% per month) on any amount not paid by Applicant to Cardinal Health when due under the terms of this Agreement. Failure or delay by Cardinal Health to bill Applicant for any such service charge will not waive Cardinal Health's right to receive the same. In the event of default in payments on any invoices or other agreements between Applicant and Cardinal Health, Cardinal Health shall have the right to declare all invoices immediately due and payable, and in the event of any bankruptcy or insolvency of Applicant, all invoices shall immediately become due and payable without notice or any further action on the part of Cardinal Health, which Applicant hereby waives. Applicant shall pay all out-of-pocket expenses, including attorneys' fees and costs, incurred by Cardinal Health to collect any amounts due under this Agreement or to otherwise enforce any of the terms of this Agreement.

5. Applicant attests to Cardinal Health that it or the pharmacist(s) employed and/or affiliated with Applicant are properly licensed with applicable state licensing agencies to receive, dispense, distribute and otherwise legally dispose of the Product. Applicant understands that by attesting to this, Cardinal Health is complying with the "good faith inquiry" standard to ensure that the Product is distributed to properly licensed and/or registered pharmacy locations. Prior to purchasing the Product from Cardinal Health hereunder, Applicant must provide Cardinal Health with copies of all such licenses and any renewals, revocations or other changes to the same.

6. Applicant agrees that Product will be purchased under Cardinal Health's standard terms and conditions as in effect from time to time and/or the terms and conditions set forth in a vendor agreement shall hereinafter be collectively referred to as the "Terms and Conditions"). The Terms and Conditions are hereby incorporated by reference and made a part hereof. Applicant acknowledges that the Terms and Conditions may be amended or modified by Cardinal Health from time to time and agrees to be bound by such modifications and/or amendments.

7. Without limiting Cardinal Health's rights under law or in equity, Cardinal Health (including its affiliates, subsidiaries, parent or related entities, collectively or individually), may from time to time exercise a right of set-off against any and all amounts due Applicant. For purposes of this Section 7, Cardinal Health shall be deemed to be a single creditor.

8. This Agreement, and any purchase orders, and all exhibits and addenda thereto constitute the entire agreement and understanding of the parties with respect to the subject matter hereof and supersede all prior written and oral agreements, proposals, bid responses, and understandings between the parties relative to the subject matter hereof. Except as otherwise provided herein, no changes to this Agreement or any purchase order will be made or be binding upon either party unless made in writing and signed by each party; provided, however, that Cardinal Health may increase, decrease, revoke or limit the amount and terms of credit extended to Applicant. No course of prior dealings between the Applicant and Cardinal Health and no usage of trade shall be relevant or admissible to supplement, to explain, or vary any of the terms of this Agreement.

9. All Applicable taxes including Federal Excise Tax will be collected as part of the sale.

10. All information provided in this Application or otherwise submitted is true and correct and is being (or will be) furnished for the purpose of obtaining/retaining credit from Cardinal Health. Applicant shall provide Cardinal Health with financial statements and such further information as may reasonably be requested by Cardinal Health from time to time. Applicant authorizes Cardinal Health to verify this information and/or additional information by obtaining data from a credit reporting agency. Applicant acknowledges and agrees to the sharing of financial statements and other information between and among Cardinal Health's subsidiaries and affiliates. Applicant authorizes Cardinal Health to request, obtain and share information with other creditors of Applicant. Applicant shall also provide to Cardinal Health advanced written notice of proposed change in twenty-five (25%) or more of the ownership or control of Applicant's business or assets. Applicant authorizes Cardinal Health to rely on the accuracy of all information provided herein unless and until any information is changed by Applicant's written notice to Cardinal Health.

11. In order to secure timely and full payment and performance of all present and future obligations of Applicant to Cardinal Health (the "Obligations"), including but not limited to all promissory notes and sales on credit, Applicant hereby grants to Cardinal Health a security interest in all of following business assets of Applicant, wherever located and whether now owned or hereafter acquired: all goods, equipment, inventory, accounts, accounts receivable, healthcare receivables, chattel paper, instruments, investment property and all general intangibles, books and records, computer programs and records, and other personal property, tangible or intangible, related to any of the foregoing (including, without limitation, all prescription files, patient lists, signs, appliances, cash registers, computers, computer software, shelving, check-outcounters, compressors, freezers, coolers, display cases, customer records, sundries, tobacco products, prescription and over-the-counter pharmaceutical products, health and beauty aids, home healthcare products and general merchandise and supplies); all accessions and additions to, substitutions for, and replacements of any of the foregoing; all proceeds or products of any of the foregoing; and all rights to payments under any insurance or warranty, guaranty, or indemnity payable with respect to any of the foregoing (collectively, the "Collateral"). All items of Collateral shall remain personal property and shall not become part of any real estate regardless of the manner of affixation. This security interest shall continue in effect until Cardinal Health is indefeasibly paid in full. Applicant hereby authorizes the Cardinal Health to file financing statements describing the Collateral, and any necessary future amendments thereto, in any and all public offices in which Cardinal

Health deems such filing to be necessary or desirable, and Applicant agrees to reimburse Cardinal Health for cost and expense of preparing and filing any such financing statements upon delivery by Cardinal Health to Applicant of an invoice therefor.

12. Applicant authorizes Cardinal Health to initiate debit and credit entries from Applicant's account indicated below and Applicant authorizes the financial institution named below (the "Institution") to debit the same such account. Authority to initiate debit entries shall remain in full force and effect until Cardinal Health and the Institution have received written notice from the Applicant of its termination of such authorization. Applicant acknowledges that it has the legal right to stop payment of a debit entry by notification to the Institution; provided, prior to such notification, Applicant

Shall provide sufficient written notice to permit Cardinal Health to take any actions it deems necessary to avoid disruption in payments from the Applicant. Applicant shall promptly notify Cardinal Health in writing of any entry to which it objects; any entry not so objected to and returned in accordance with the applicable rules relating to corporate payment entries of the National Automated Clearing House Association and its related member associations (the "Rules") shall be deemed accepted by Applicant as to amount. Applicant represents and warrants that (i) that, if Applicant is a natural person, the account is maintained primarily for commercial purposes and not for personal, family or household purposes; (ii) that the signature(s) below are all the signature(s) necessary to make this authorization effective as to entries to the account; and (iii) Applicant will continue to maintain the account while this authorization is in effect. Neither Applicant nor Cardinal Health is liable for any act or omission of any automated clearing house, depository, or other person, including the Institution. Applicant will indemnify and hold Cardinal Health harmless for any and all claims, demands, losses, liabilities or expense, including attorneys' fees and expenses, directly or indirectly resulting or arising out of the breach of these warranties and representations. If any automated debit entry is returned because of insufficient funds or no open account, Cardinal Health will assess and Applicant agrees that it shall be liable for a charge of $25. NEITHER PARTY SHALL BE LIABLE UNDER THIS SECTION 12 FOR ANY SPECIAL, INCIDENTAL OR CONSEQUENTIAL DAMAGES, EVEN IF IT IS ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.

Bank Name: _Chase_
Bank Transit ABA#: ▮▮▮▮▮▮▮▮
Bank Account #: ▮▮▮▮▮▮▮▮

13. The Authorized Signatory represents that he/she has the authority to bind Applicant to this Agreement. The Applicant acknowledges and agrees that this is an application for business credit and the transactions contemplated are not for personal, family or household purposes. Recognizing that the owner's/partner's/shareholder's/managing member's credit history may be a factor in the evaluation of Applicant's credit history, the owner(s) / partners / shareholder(s) / managing member hereby consent to the use of a consumer credit report by Cardinal Health as it may deem necessary in the credit evaluation process and for periodic review for the purpose of maintaining the credit relationship.

14. Whenever possible, each provision of this Agreement shall be interpreted in such a manner as to be effective and valid under applicable laws; but, if any provision of this Agreement.

15. Any action(s) to enforce the terms of this Agreement may be brought in any court of competent jurisdiction selected by Cardinal Health. This Agreement will be governed by and construed in accordance with the laws of the State of Ohio, without regard to conflict-of-laws principles, (and specifically excluding the provisions

of the United Nations Convention on the International Sale of Goods.)

16. The Applicant and Cardinal Health agree that the use of electronic transmission, including but not limited to e-mail or other transmissions via the Internet or World Wide Web, in entering into and in exercising their rights and performing their obligations under this Agreement is in the best interests of all of the parties and shall be permissible, notwithstanding any requirement of the Uniform Commercial Code or any other applicable law that might otherwise be considered unsatisfied as a result of the utilization of such media. The Applicant and Cardinal Health therefore agree that the Uniform Electronic Transactions Act, as promulgated by the National Conference of Commissions on Uniform State Laws, shall be applicable to the construction of this Agreement and any transactions hereunder, whether or not such Act shall have been adopted in any jurisdiction. By way of illustration and not of limitation, the Applicant and Cardinal Health agree to the following: (a) any document (including this Agreement) transmitted by electronic transmission shall be treated in all respects as an original signed document;

(b) the signature (including an electronic signature) of any Party shall be considered for these purposes as an original signature; (c) any such electronic transmission shall be considered to have the same binding legal effect as an original document; and (d) neither Party shall raise the use of electronic transmission as a defense to this Agreement or in matters relating to any transaction pursuant to this Agreement, and each Party waives such defense.

17. If this application for business credit is denied, Applicant has the right to a written statement of the specific reasons for the denial. Cardinal Health will send Applicant a written statement of the specific reason(s) for the denial within thirty (30) days of receiving a request for a written statement. The Federal Equal Credit Opportunity Act and similar state laws prohibit creditors from discriminating against credit applicant on the basis of race, color, religion, national origin, sex, sexual orientation, marital status, familial status, age (provided the applicant has the capacity to enter into a binding contract), handicapping condition of the applicant; because all or part of the applicant's income derives from any public assistance program; or because the applicant has in good faith exercised any right under the Consumer Credit Protection Act. The federal agency that administers compliance with this law is the Federal Trade Commission, Equal Credit Opportunity, Washington, D.C. 20580.

18. In the event Applicant enters into any Loan Agreement or any one or more promissory notes, security agreements, mortgages, guaranties, control agreements, or other related documents (as the same may be amended, restated, supplemented, or otherwise modified from time to time, collectively, the "Loan Documents"), and there is any inconsistency between the terms and conditions of this Application and the terms and conditions of any Loan Document, the terms and conditions of the Loan Documents shall control.

_Brownsville Pharmacy 4, LLC_
**Printed Legal Entity Name of Applicant as it appears in Section I of the Application**

BY: _Srinivasa Tolla_
**Authorized Signature**
ITS: _Managing Member_
**Authorized Signatory Title**

_Srinivasa Tolla_
**Printed Name of Signatory**
**Date.**

**Section IV GUARANTY**

Each undersigned principal of Applicant (as defined above) (each a "Guarantor"), by reason of his/her financial interest in Applicant and as an inducement of Cardinal Health to extend credit to Applicant, and intending to be legally bound, hereby jointly and severally, irrevocably and unconditionally guaranties to Cardinal Health, and its subsidiaries, affiliates and successors the prompt and full payment (and not merely the ultimate collection) and performance of all Obligations (as defined above) to Cardinal Health, whether now existing or hereafter arising, including any payment made to Cardinal Health that is subsequently avoided in bankruptcy or recovered from Cardinal Health for any reason. Each Guarantor hereby waives (i) notice of any and all acceptances of this guaranty, presentment for payment, demand, notice of dishonor or other nonpayment, protest, and notice of protest with respect to any and all Obligations; and (ii) any and all defenses arising by reason of any failure by Cardinal Health to pursue Applicant or any of its assets, any impairment of collateral, notice of sale or other disposition of any collateral or security now held or hereafter acquired by Cardinal Health, and any and all suretyship defenses or defenses arising out of the guarantor-principal relationship. Without the consent of or notice to any Guarantor: (a) any extension, forbearance, lenience, and indulgence of any nature, whether one or more, may be granted to Applicant; (b) any contracts, agreements, leases, other documents or arrangements may be amended, replaced or modified in any way whatsoever; (c) additional collateral, security, or guaranties may be accepted from Applicant or others from time to time; and (d) any collateral, security, or other guaranties may be released, modified, or substituted from time to time. Each Guarantor authorizes Cardinal Health to verify this information and/or additional information by obtaining data from a credit reporting agency. This is a continuing guaranty and the obligations of each Guarantor may not be revoked or limited so long as Cardinal Health continues to extend credit to Applicant and/or its successors and assigns. Likewise, the obligations of each Guarantor may not be revoked or limited, regardless of renewals, extensions or modifications of trade terms or credit limits granted to Applicant by Cardinal Health. Each Guarantor's obligations under this Guaranty are independent of and separate from the obligations of Applicant. This Guaranty shall be governed under the laws of the State of Ohio. Any action(s) to enforce the terms of this Guaranty may be brought in any court of competent jurisdiction selected by Cardinal Health.

EACH GUARANTOR ACKNOWLEDGES THAT HIS/HER INDIVIDUAL CREDIT HISTORY MAY BE A FACTOR IN THE EVALUATION OF THE CREDIT HISTORY OF THE APPLICANT AND HEREBY CONSENTS AND AUTHORIZES THE USE OF A CONSUMER CREDIT REPORT ON THE UNDERSIGNED BY CARDINAL HEALTH FROM TIME TO TIME AS CARDINAL HEALTH MAY DEEM NECESSARY IN ITS CREDIT EVALUATIONS.

1. _Srinivas M Talla_
Signature

_Srinivas Talla_
Printed Name

Social Security # ▮▮▮▮▮▮▮

Address: _906 Vasser Pl, Fish Kill NY_

Telephone #: _845-392-8254_ Date: _7-15-17_

2. _____
Signature

_____
Printed Name

Social Security # _____

Address: _____

Telephone #: _____ Date: _____

3. _____
Signature

_____
Printed Name

Social Security # _____

Address: _____

Telephone #: _____ Date: _____

4. _____
Signature

_____
Printed Name

Social Security # _____

Address: _____

Telephone #: _____ Date: _____

COLUMBUS/1270119

**Cardinal**Health

CREDIT APPLICATION

## Section I – GENERAL INFORMATION

APPLICANT'S FIRM NAME     BROWNSVILLE  PHARMACY  # 2  LLC

_Ruben Torres Blvd._  Brownsville  _Tx_  956 542 5100  956 542 5703
APPLICANT'S BUSINESS ADDRESS                    City          Telephone Number      Fax Number

SHIPPING ADDRESS (only if different from business address)

BILLING ADDRESS (only if different from business address)

## Section II – FINANCIAL INFORMATION

3. BUSINESS TYPE (Check One)    Proprietorship ☐    Partnership ☐    S Corp ☐    C Corp ☐    LLC ☒    Other ☐

4. Federal Tax I.D. #

   State I.D#

   State of Incorporation     TEXAS

5. HAVE UNDER WHICH YOU HAVE DAY-TO-DAY OPERATIONS AND CURRENTLY OPERATING UNDER/DOING BUSINESS AS?

   AUTREY  PHARMACY  # 2

6. LIST ANY AFFILIATED PHARMACY(IES) that are now or were recently processing?

   AUTREY  PHARMACY  # 1

7. LIST NAME OF PROPRIETOR, PARTNERS or OFFICERS OF APPLICANT (include out-of-state, if necessary):

| Name | Title | % Owned | Home Address | Social Security No. |
|------|-------|---------|--------------|---------------------|
| SRINIVASA TALLA | MEMBER | 81 | 406 VASSAR PL FISHKILL NY 12524 | ████████ |
| SRINIVAS GADIRAJU | MEMBER | 19 | ONE OVALDOOR DR. RIVERDALE NJ 07457 | ████████ |
|  |  |  |  |  |
|  |  |  |  |  |

8. LIST NAMES AND ADDRESSES OF OTHER HEALTHCARE COMPANIES IN WHICH ANY OF THE INDIVIDUALS OR ORGANIZATIONS LISTED IN QUESTION 7 ABOVE ALSO HAVE AN OWNERSHIP INTEREST, direct or indirect, in part or full.

| Name of Healthcare Company | State of Incorporation/Location | Nature of Affiliation/Interest |
|----------------------------|--------------------------------|--------------------------------|
| Name of Healthcare Company |  |  |
| Name of Healthcare Company |  |  |

EXHIBIT
4
tabbies

PRIMARY BUSINESS CONTACT _SRI TALLA_ _MEMBER_ _545 392 8284_ _STALLA@HOTMAIL.C_

ESTIMATED MONTHLY PURCHASES $ _200,000_ ESTIMATED _$100,000_

TRANS REQ... _WEEKLY_

TYPE OF BUSINESS OF APPLICANT _RETAIL PHARMACY_

Section III - ... AND DISCLOSURES

[illegible]

BROWNSVILLE PHARMACY #2 — Srinivasa Talla (signature) — MEMBER — [illegible] — SRINIVASA TALLA — 12/3/12

Section IV - SECURITY AGREEMENT

[illegible] DEC 03 [illegible]

[illegible]

Srinivasa Talla (signature)

MEMBER

Section V - GUARANTY

[illegible]

THE UNDERSIGNED PERSONAL GUARANTOR ACKNOWLEDGES THAT HIS/HER INDIVIDUAL CREDIT HISTORY MAY BE A FACTOR IN THE EVALUATION OF THE CREDIT HISTORY OF THE APPLICANT ... [illegible]

Srinivasa Talla (signature) — SRINIVASA TALLA — 12/3/12

(signature) — SRINIVAS GADIRAJU — 12/3/12

[illegible]

10/14/2015  12:48  9565425183                                                    PAGE  01/13

**CardinalHealth**

Updated: 7/1/2014

Credit Application

### SECTION I - GENERAL INFORMATION

1. Legal Entity Name: Fry Pharmacy LLC
2. D/B/A (if any): Fry's Prescription Pharmacy
3. Business Type (check one):
   Proprietorship ___ Partnership ___ (S) Corp ___ (C) Corp ___ LLC ✓ Other ___
4. Legal Entity Business Address: 311 N Sam Houston San Benito Ave TX 78586

   Business Phone #: 956-399-2453  Business Fax #: 956-399-2959

   Shipping Address (if different from business address): N/A

   Billing Address (if different from business address): N/A

5. Billing Contact name: Srinivasa Talla  Contact Phone # 845-392-8264

   Billing Contact e-mail address: stalla@hotmail.com

6. Primary Business Contact: Srinivasa Talla  managing member  845-392-8264  stalla@hotmail
   Name            Title            Phone #        Email Address

### SECTION II - FINANCIAL INFORMATION

7. Federal Tax ID #: ▮▮▮▮▮▮▮▮

   State Tax ID #: _____ (This number must correspond with sales tax exemption certificate).

   State of Incorporation: Texas

8. List Any Businesses Affiliated with Legal Entity on Line #1 (Include Addresses & Account #'s):

   Aubrey Pharmacy 1 | 805 Central Blvd Brownsville Tx
   Aubrey Pharmacy 2 | 1305 E Ruben Torres Blvd Brownsville, Tx

9. List Name of Proprietor, Partners, or Officers of Legal Entity:

   Srinivasa Talla  managing  80  406 Vasser Pl Fishkill NY 12524
   Name            Title member  %owned  Home Address

   Srinivas Brdiraju  managing  20  1 overlook Dr. Riverdale, NJ 07457
   Name            Title member  %owned  Home Address

   _____  _____  _____  _____
   Name            Title          %owned   Home Address

**EXHIBIT**
**5**

10/14/2015  1:39PM (GMT-04:00)

17. Type of Business of Applicant:

_____ Acute   _____ Primary Care   _____ Specialty   _____ Home Health   _____ Extended   _____ Long Term
__✓__ Pharmacy   _____ Closed Door   _____ Internet   _____ Mail Order   _____ Supplier   _____ Government
_____ Surgery Center   _____ Laboratory   _____ Distributor / Wholesaler
_____ Other _____

## Section III--Agreement

1. As an inducement for Cardinal Health* to accept orders from or otherwise extend or make available credit to Applicant, the undersigned Applicant hereby agrees to comply with the following terms of sale, should Cardinal Health elect to extend such credit.

2. The Applicant acknowledges and agrees that it does not and will not redistribute any product distributed by Cardinal Health to the secondary market, including but not limited to, (i) pharmaceutical product purchased from Cardinal Health; and/or (ii) Cardinal Health self-manufactured products.

3. Until the Product is paid for in full, Cardinal Health retains, and the Applicant hereby grants a security interest to Cardinal Health in the product Cardinal Health has sold or is selling to Applicant (the "Product").

4. All payments shall be made in full, in accordance with the payment terms, via ACH direct debit or other payment forms acceptable to Cardinal Health. Cardinal Health may assess a service charge calculated at the rate of 1.5% per month (or the maximum rate allowed by law, if such rate is less than 1.5% per month) on any amount not paid by Applicant to Cardinal Health when due under the terms of this Agreement. Failure or delay by Cardinal Health to bill Applicant for any such service charge will not waive Cardinal Health's right to receive the same. In the event of default in payments on any invoices, Cardinal Health shall have the right to declare all invoices immediately due and payable. Applicant shall pay all out-of-pocket expenses, including attorneys' fees and costs, incurred by Cardinal Health to collect any amounts due under this Agreement or to otherwise enforce any of the terms of this Agreement.

5. Applicant attests to Cardinal Health that it or the pharmacist(s) employed and/or affiliated with Applicant are properly licensed with applicable state licensing agencies to receive, dispense, distribute, and otherwise legally dispose of the Product. Applicant understands that by attesting to this, Cardinal Health is complying with the "good faith inquiry" standard to ensure that the Product is distributed to properly licensed and/or registered pharmacy locations. Prior to purchasing the Product from Cardinal Health hereunder, Applicant must provide Cardinal Health with copies of all such licenses and any renewals, revocations or other changes to the same.

6. Applicant agrees that Product will be purchased under Cardinal Health's standard terms and conditions as in effect from time to time and/or the terms and conditions set forth in a vendor agreement between Applicant and Cardinal Health (the standard terms and conditions and the vendor agreement shall hereinafter be collectively referred to as the "Terms and Conditions"). The Terms and Conditions are hereby incorporated by reference and made a part hereof. Applicant acknowledges that the Terms and Conditions may be amended or modified by Cardinal Health from time to time and agrees to be bound by such modifications and/or amendments.

7. Without limiting Cardinal Health's rights under law or in equity, Cardinal Health (including its affiliates, subsidiaries, parent or related entities, collectively or individually), may exercise a right of set-off against any and all amounts due Applicant. For purposes of this Section 7, Cardinal Health shall be deemed to be a single creditor.

8. This Agreement, and any purchase orders, and all exhibits and addenda thereto constitute the entire agreement and understanding of the parties with respect to the subject matter hereof and supersede all prior written and oral agreements, proposals, bid responses, and understandings between the parties relative to the subject matter hereof. Except as otherwise provided herein, no changes to this Agreement or any purchase order will be made or be binding upon either party unless made in writing and signed by each party; provided, however, that Cardinal Health may increase, decrease, revoke or limit the amount and terms of credit extended to Applicant. No course of prior dealings between the Applicant and Cardinal Health and no usage of trade shall be relevant or admissible to supplement, to explain, or vary any of the terms of this Agreement.

9. All Applicable taxes including Federal Excise Tax will be collected as part of the sale.

10. All information provided in this Application or otherwise submitted is true and correct and is being (or will be) furnished for the purpose of obtaining/retaining credit from Cardinal Health. Applicant shall provide Cardinal Health with financial statements and such further information as may reasonably be requested by Cardinal Health from time to time. Applicant authorizes Cardinal Health to verify this information and/or additional information by obtaining data from a credit reporting agency. Applicant acknowledges and agrees to the sharing of financial statements and other information between and among Cardinal Health's subsidiaries and affiliates. Applicant authorizes Cardinal Health to request, obtain and share information with other creditors of Applicant. Applicant shall also provide to Cardinal Health advanced written notice of a proposed change in twenty-five (25%) or more of the ownership or control of Applicant's business or assets. Applicant authorizes Cardinal Health to rely on the accuracy of all information provided herein unless and until any information is changed by Applicant's written notice to Cardinal Health.

11. In order to secure timely and full payment and performance of all present and future obligations of Applicant to Cardinal Health (the "Obligations"), including but not limited to all promissory notes and sales on credit, Applicant hereby grants to Cardinal Health a security interest in all of following business assets of Applicant, wherever located and whether now owned or hereafter acquired: all goods, equipment, inventory, accounts, accounts receivable, chattel paper, instruments, investment property and all general intangibles, books and records, computer programs and records, and other personal property, tangible or intangible, related to any of the foregoing (including, without limitation, all prescription files, patient lists, signs, appliances, cash registers, computers, computer software, shelving, check-out counters, compressors, freezers, coolers, display cases, customer records, sundries, tobacco products, prescription and over-the-counter pharmaceutical products, health and beauty aids, home healthcare products and general merchandise and supplies); all accessions and additions to, substitutions for, and replacements of any of the foregoing; all proceeds or products of any of the foregoing; and all rights to payments under any insurance or warranty, guaranty, or indemnity payable with respect to any of the foregoing (collectively, the "Collateral"). All items of Collateral shall remain personal property and shall not become part of any real estate regardless of the manner of affixation. This security interest shall continue in effect until Cardinal Health is indefeasibly paid in full.

12. Applicant authorizes Cardinal Health to initiate debit entries from Applicant's account indicated below and Applicant authorizes the financial institution named below (the "Institution") to debit the same such account. Authority to initiate debit entries shall remain in full force and effect until Cardinal Health and the Institution have received written notice from the Applicant of its termination of such authorization. Applicant acknowledges that it has the legal right to stop payment of a debit entry by notification to the Institution; provided, prior to such notification, Applicant shall provide sufficient written notice to permit Cardinal Health to take any actions it deems necessary to avoid disruption in payments from the Applicant.

Bank Name: Chase

Bank Transit ABA#: ███████

Bank Account #: ███████

13. The Authorized Signatory represents that he/she has the authority to bind Applicant to this Agreement. The Applicant acknowledges and agrees that this is an application for business credit and the transactions contemplated are not for primarily personal, family or household purposes. Recognizing that the owner's/partner's/shareholder's/managing member's credit history may be a factor in the evaluation of Applicant's credit history, the owner(s) / partners / shareholder(s) / managing member hereby consent to the use of a consumer credit report by Cardinal Health as it may deem necessary in the credit evaluation process and for periodic review for the purpose of maintaining the credit relationship.

14. Whenever possible, each provision of this Agreement shall be interpreted in such a manner as to be effective and valid under applicable laws; but, if any provision of this Agreement shall be prohibited by or invalid under applicable law, such provision shall be ineffective to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of the Agreement.

15. Any action(s) to enforce the terms of this Agreement may be brought in any court of competent jurisdiction selected by Cardinal Health. This Agreement will be governed by and construed in accordance with the laws of the State of Ohio, without regard to conflict-of-laws principles, (and specifically excluding the provisions of the United Nations Convention on the International Sale of Goods.)

16. The Applicant and Cardinal Health agree that the use of electronic transmission, including, but not limited to, e-mail or other transmissions via the Internet or World Wide Web, in entering into and in exercising their rights and performing their obligations under this Agreement is in the best interests of all of the parties and shall be permissible, notwithstanding any requirement of the Uniform Commercial Code or any other applicable law that might otherwise be considered unsatisfied as a result of the utilization of such media. The Applicant and Cardinal Health therefore agree that the Uniform Electronic Transactions Act, as promulgated by the National Conference of Commissions on Uniform State Laws, shall be applicable to

10/14/2015  1:39PM (GMT-04:00)

the construction of this Agreement and any transactions hereunder, whether or not such Act shall have been adopted in any jurisdiction. By way of illustration and not of limitation, the Applicant and Cardinal Health agree to the following:

(a)   any document (including this Agreement) transmitted by electronic transmission shall be treated in all respects as an original signed document;

(b)   the signature (including an electronic signature) of any Party shall be considered for these purposes as an original signature;

(c)   any such electronic transmission shall be considered to have the same binding legal effect as an original document; and

(d)   neither Party shall raise the use of electronic transmission as a defense to this Agreement or in matters relating to any transaction pursuant to this Agreement, and each Party waives such defense.

17. If this application for business credit is denied, Applicant has the right to a written statement of the specific reasons for the denial. Cardinal Health will send Applicant a written statement of the specific reason(s) for the denial within thirty (30) days of receiving a request for a written statement. The Federal Equal Credit Opportunity Act and similar state laws prohibit creditors from discriminating against credit applicant on the basis of race, color, religion, national origin, sex, sexual orientation, marital status, familial status, age (provided the applicant has the capacity to enter into a binding contract), handicapping condition of the applicant; because all or part of the applicant's income derives from any public assistance program; or because the applicant has in good faith exercised any right under the Consumer Credit Protection Act. The federal agency that administers compliance with this law is the Federal Trade Commission, Equal Credit Opportunity, Washington, D.C. 20580.

Fry Pharmacy LLC

Printed Legal Entity Name of Applicant as it appears in Section I of the Application

BY: _____
Authorized Signature

ITS: Managing Member
Authorized Signatory Title

Srinivasa Talla
Printed Name of Signatory

Date: 10-13-15

## Section IV - Guaranty

Each undersigned principal of Applicant (as defined above), by reason of his/her financial interest in Applicant and as an inducement of Cardinal Health to extent credit to Applicant, and intending to be legally bound, hereby jointly and severally, irrevocably and unconditionally guaranty to Cardinal Health, and its subsidiaries, affiliates and successors (each a "Guaranty Party") the prompt and full payment (and not merely the ultimate collection) and performance of all Obligations (as defined above) to Cardinal Health, whether now existing or hereafter arising, including any payment made to Cardinal Health that is subsequently avoided in bankruptcy or recovered from Cardinal Health for any reason. Each Guaranty Party authorizes Cardinal Health to verify this information and/or additional information by obtaining data from a credit reporting agency. This is a continuing guaranty and the obligations of each Guaranty Party may not be revoked or limited so long as Cardinal Health continues to extend credit to Applicant and/or its successors and assigns. Likewise, the obligations of each Guaranty Party may not be revoked or limited, regardless of renewals, extensions or modifications of trade terms or credit limits granted to Applicant by Cardinal Health. Each Guaranty Party's obligations under this Guaranty are independent of and separate from the obligations of Applicant. This Guaranty shall be governed under the laws of the State of Ohio. Any action(s) to enforce the terms of this Guaranty may be brought in any court of competent jurisdiction selected by Cardinal Health.

EACH GUARANTY PARTY ACKNOWLEDGES THAT HIS/HER INDIVIDUAL CREDIT HISTORY MAY BE A FACTOR IN THE EVALUATION OF THE CREDIT HISTORY OF THE APPLICANT AND HEREBY CONSENTS AND AUTHORIZES THE USE OF A CONSUMER CREDIT REPORT ON THE UNDERSIGNED BY CARDINAL HEALTH FROM TIME TO TIME AS CARDINAL HEALTH MAY DEEM NECESSARY IN ITS CREDIT EVALUATIONS.

| Signature | Signature | Signature |
|---|---|---|
| Printed Name: Srinivasa Talla | Printed Name: Srinivos Gadiraju | Printed Name: |
| Social Security # ▓▓▓ | Social Security # ▓▓▓ | Social Security # |
| Address: 406 Vassar Place | Address: 1 Overlook Dr | Address: |
| Fishkill NY 12524 | Riverdale, NJ | |
| Telephone #: 845-399-8064 | Telephone #: 201-323-4700 | Telephone #: |
| Date: 10-13-15 | Date: | Date: |

*The term "Cardinal Health" shall mean collectively all subsidiaries, related and affiliated companies of Cardinal Health, Inc. ("CHI"), an Ohio corporation, and successors and assigns thereof, whether existing now or in the future, including but not limited to Parmed Pharmaceuticals, LLC.

**Independent Pharmacy Returns Program**

# Enrollment form

The Independent Pharmacy Returns Program is designed to simplify the labor-intensive and time-consuming process of tracking credits when returning unsalable merchandise to third-party returns processors. The traditional process requires that the pharmacy track credits occurring during a period of 18 to 24 months back to a third-party return submission.

Because pharmacies are returning unsalable product periodically throughout the year, the effort required to correlate the credits to the correct request is oftentimes difficult. In addition, while these submissions are unresolved the pharmacy does not have access to valuable working capital dollars. This Independent Pharmacy Returns Program, a pre-funded solution, dramatically decreases the time from return submission to receipt of cash. It also outsources the laborious task of tracking what returns have been processed and correlating credits to specific products. The Independent Pharmacy Returns Program simplifies the process of returning unsalable merchandise previously purchased from Cardinal Health. Thus, the program is available only to Cardinal Health customers that have executed a Prime Vendor Agreement (PVA). Products purchased from a source other than Cardinal Health will not be processed.

We have partnered with both Inmar* and Pharma Logistics* processors for this program. To take advantage of the Independent Pharmacy Returns Program, you must first register with either Inmar* or Pharma Logistics*.

███████████████████████████████

Once enrolled, Inmar* or Pharma Logistics* will contact you to train you on their specific returns process.

---

**Enroll now for immediate benefits!**

Select one:  ☒ Inmar   ☐ Pharma Logistics

Autrey Pharmacy 3
Pharmacy name

800 E. Alton Gloor Blvd Unit B    Brownsville    TX    78526
Pharmacy address                City          State   Zip

267-210-8357                    956-230-2977
Pharmacy phone number           Pharmacy fax number

Srinivas Gadiraju              Brownsvillepharmacies@gmail.com
Primary contact                 Contact email

████████████████    ████████████          DEA expiration date
copy of your DEA license may be requested at a later date)

Signature                        01-23-2020
                                 Date

Srinivas Gadiraju
Printed name

President
Title / position

Your signature above indicates that you have read, understand and agree to the terms and conditions of the Independent Pharmacy Returns Program located on the reverse side of this enrollment form.



**Cardinal**Health
Essential to care™

███████████████████████████████

EXHIBIT
6

## Independent Pharmacy Returns Program
## Terms and Conditions.

1. **Program Standards.** Cardinal has the right to review the returns submitted to Inmar and Pharma Logistic. If the returns appears to be based on suspicious conduct, Cardinal may, acting in its sole discretion, delay payment until the matter is resolved to Cardinal's satisfaction. Cardinal has the right to adjust pricing applied to the returns by Inmar and Pharma Logistic based on actual value of the returns.

2. **Term**

a. Term of Program. Participation in the Program shall be effective as of the Effective Date and will continue in effect for a period of twelve (12) months and shall automatically renew for successive twelve (12) month periods, unless terminated as proved below.

b. Termination by Participant. Participant may terminate enrollment in the Program for its convenience upon giving Cardinal sixty (60) days' prior written notice.

c. Termination by Cardinal.

   i. Cardinal may terminate Participant's enrollment in the Program immediately if Cardinal has reason to believe, acting its sole discretion, that Participant has or is attempting to (i) divert product for purposes contrary to the intent of the Program, such as but not limited to, purchasing product for the sole purpose of returning it through the Program, including short-dated products; (ii) returning product purchased from a source other than Cardinal Health; and (iii) engaging in misleading and unethical activities.

   ii. Cardinal may terminate Participant's enrollment in the Program without cause upon providing Participant (30) day's prior written notice.

   iii. Notwithstanding the above, Cardinal reserves the right to terminate the entire Program, in whole or in part, acting in its sole discretion.

3. **Program Costs.** Cardinal will pay to Participant 80% of the total returnable value of the unsaleable product, which takes into consideration Cardinal's labor costs associated with tracking/reconciling the credits. The third-party processor fees associated with the Program are paid by Cardinal. The percent of the returnable value of unsaleable product received by Cardinal is fair and adequate compensation based on the fair market price of administering the Program.

4. **Warranty Disclaimer.** ALL SERVICES PROVIDED BY CARDINAL HEALTH HEREUNDER ARE PROVIDED AS IS WITHOUT ANY REPRESENTATIONS OR WARRANTIES OF ANY KIND. EXCEPT AS EXPRESSLY PROVIDED HEREIN, CARDINAL HEALTH MAKES NO WARRANTY OF ANY KIND, WHETHER EXPRESS, IMPLIED, STATUTORY, OR OTHERWISE, INCLUDING WITHOUT LIMITATION ANY IMPLIED WARRANTIES OF TITLE, NON-INFRINGEMENT, INFORMATION, MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE (WHETHER OR NOT CARDINAL HEALTH KNOWS OR HAS REASON TO KNOW OF SUCH PURPOSE), WHETHER ARISING BY LAW, CUSTOM, USAGE IN THE TRADE OR BY COURSE OF DEALING. IN NO EVENT SHALL CARDINAL HEALTH HAVE ANY LIABILITY TO PARTICIPANT FOR ANY LOST PROFITS, LOSS OF DATA, LOSS OF USE, COSTS OF PROCUREMENT OR SUBSTITUTE GOODS OR SERVICES.

5. **Confidentiality.** Participant agrees that the Program, this Enrollment, and the terms hereof, and any information or material that Cardinal or Processors may provide or which Participant may become aware regarding the Program, including information related to Cardinal's business plans, systems, processes and strategies, all constitute and is defined as "Cardinal Health Confidential Information". Participant shall not disclose or use any Cardinal Health Confidential Information for any purpose other than to exercise its rights hereunder. Participant shall protect the Cardinal Health Confidential Information in the same manner that it protects the confidentiality of its own proprietary and confidential information of like kind, but in no event shall it exercise less than reasonable care in protecting such Confidential Information. If Participant is compelled by law to disclose any Cardinal Health Confidential Information, it shall provide Cardinal Health with prior notice of such compelled disclosure and reasonable assistance to contest the disclosure at Cardinal Health's request and expense.

6. **Protected Health Information.** Cardinal will comply with all applicable privacy laws and regulations in providing the Program to Participant, including without limitation, the Health Insurance Portability and Accountability Act and the privacy regulations promulgated thereunder ("HIPAA").

7. **Limitation of Liability.** CARDINAL SHALL NOT BE LIABLE FOR ANY INDIRECT, SPECIAL OR CONSEQUENTIAL DAMAGES, EVEN IF IT IS ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. NOTWITHSTANDING ANYTHING TO THE CONTRARY, CARDINAL'S AGGREGATE LIABILITY HEREUNDER SHALL NOT EXCEED THE FEES PAID TO IT HEREUNDER.

8. **Indemnification.** Participant shall defend, indemnify and hold Cardinal its successors, assigns, officers, directors, and employees harmless with respect to all fines, penalties, claims, liability, damage, loss and expenses, and penalties imposed upon Cardinal including reasonable attorney's fees which are related to, caused by, or arise out of the Enrollment or in connection with: (i) receipt by Cardinal of inaccurate, false or misleading information; (ii) fraud, negligence or willful misconduct of Participant; and, (iii) violation of any laws or regulations, except to the extent that any of the foregoing arise from the negligence or willful misconduct of Cardinal. Participant shall pay Cardinal reasonable attorney's fees and all costs of litigation associated with enforcement of the obligation set forth in this section.



**CardinalHealth**

*Essential to care™*

© 2018 Cardinal Health. All rights reserved. CARDINAL HEALTH, the Cardinal Health LOGO and ESSENTIAL TO CARE are trademarks of Cardinal Health and may be registered in the US and/or in other countries. All other marks are the property of their respective owners. Lit. No. 1RI18-769745 (02/2018)

cardinalhealth.com

**Independent Pharmacy Returns Program**

# Enrollment form

The Independent Pharmacy Returns Program is designed to simplify the labor-intensive and time-consuming process of tracking credits when returning unsalable merchandise to third-party returns processors. The traditional process requires that the pharmacy track credits occurring during a period of 18 to 24 months back to a third-party return submission.

Because pharmacies are returning unsalable product periodically throughout the year, the effort required to correlate the credits to the correct request is oftentimes difficult. In addition, while these submissions are unresolved the pharmacy does not have access to valuable working capital dollars. This Independent Pharmacy Returns Program, a pre-funded solution, dramatically decreases the time from return submission to receipt of cash. It also outsources the laborious task of tracking what returns have been processed and correlating credits to specific products. The Independent Pharmacy Returns Program simplifies the process of returning unsalable merchandise previously purchased from Cardinal Health. Thus, the program is available only to Cardinal Health customers that have executed a Prime Vendor Agreement (PVA). Products purchased from a source other than Cardinal Health will not be processed.

We have partnered with both Inmar® and Pharma Logistics® processors for this program. To take advantage of the Independent Pharmacy Returns Program, you must first register with either Inmar® or Pharma Logistics®.

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

Once enrolled, Inmar® or Pharma Logistics® will contact you to train you on their specific returns process.

---

## Enroll now for immediate benefits!

Select one:  ☒ Inmar    ☐ Pharma Logistics

Pharmacy name __Harlingen Pharmacy__

Pharmacy address __1616 N Ed Carey drive__   City __Harlingen__   State __TX__   Zip __78550__

Pharmacy phone number __956 230 3200__

Primary contact __Srinivasa Gadiraju__   Contact email __Brownsvillepharmacies@gmail.com__

DEA number ▓▓▓▓▓▓ _(a copy of your DEA license may be requested at a later date)_   DEA expiration date __10-31-2022__

Signature __[signature]__   Date __01/30/2020__

Printed name __SRINIVAS GADIRAJU__

Title / position __OWNER / MEMBER__

Your signature above indicates that you have read, understand and agree to the terms and conditions of the Independent Pharmacy Returns Program located on the reverse side of this enrollment form.

**Cardinal**Health
Essential to care™

EXHIBIT
7

## Independent Pharmacy Returns Program
## Terms and Conditions.

1. **Program Standards.** Cardinal has the right to review the returns submitted to Inmar and Pharma Logistic. If the returns appears to be based on suspicious conduct, Cardinal may, acting in its sole discretion, delay payment until the matter is resolved to Cardinal's satisfaction. Cardinal has the right to adjust pricing applied to the returns by Inmar and Pharma Logistic based on actual value of the returns.

2. **Term**

a. <u>Term of Program.</u> Participation in the Program shall be effective as of the Effective Date and will continue in effect for a period of twelve (12) months and shall automatically renew for successive twelve (12) month periods, unless terminated as proved below.

b. <u>Termination by Participant.</u> Participant may terminate enrollment in the Program for its convenience upon giving Cardinal sixty (60) days' prior written notice.

c. <u>Termination by Cardinal.</u>

   i. Cardinal may terminate Participant's enrollment in the Program immediately if Cardinal has reason to believe, acting its sole discretion, that Participant has or is attempting to (i) divert product for purposes contrary to the intent of the Program, such as but not limited to, purchasing product for the sole purpose of returning it through the Program, including short-dated products; (ii) returning product purchased from a source other than Cardinal Health; and (iii) engaging in misleading and unethical activities.

   ii. Cardinal may terminate Participant's enrollment in the Program without cause upon providing Participant (30) day's prior written notice.

   iii. Notwithstanding the above, Cardinal reserves the right to terminate the entire Program, in whole or in part, acting in its sole discretion.

3. **Program Costs.** Cardinal will pay to Participant 80% of the total returnable value of the unsaleable product, which takes into consideration Cardinal's labor costs associated with tracking/reconciling the credits. The third-party processor fees associated with the Program are paid by Cardinal. The percent of the returnable value of unsaleable product received by Cardinal is fair and adequate compensation based on the fair market price of administering the Program.

4. **Warranty Disclaimer.** ALL SERVICES PROVIDED BY CARDINAL HEALTH HEREUNDER ARE PROVIDED AS IS WITHOUT ANY REPRESENTATIONS OR WARRANTIES OF ANY KIND. EXCEPT AS EXPRESSLY PROVIDED HEREIN, CARDINAL HEALTH MAKES NO WARRANTY OF ANY KIND, WHETHER EXPRESS, IMPLIED, STATUTORY, OR OTHERWISE, INCLUDING WITHOUT LIMITATION ANY IMPLIED WARRANTIES OF TITLE, NON-INFRINGEMENT, INFORMATION, MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE (WHETHER OR NOT CARDINAL HEALTH KNOWS OR HAS REASON TO KNOW OF SUCH PURPOSE), WHETHER ARISING BY LAW, CUSTOM, USAGE IN THE TRADE OR BY COURSE OF DEALING. IN NO EVENT SHALL CARDINAL HEALTH HAVE ANY LIABILITY TO PARTICIPANT FOR ANY LOST PROFITS, LOSS OF DATA, LOSS OF USE, COSTS OF PROCUREMENT OR SUBSTITUTE GOODS OR SERVICES.

5. **Confidentiality.** Participant agrees that the Program, this Enrollment, and the terms hereof, and any information or material that Cardinal or Processors may provide or which Participant may become aware regarding the Program, including information related to Cardinal's business plans, systems, processes and strategies, all constitute and is defined as "Cardinal Health Confidential Information". Participant shall not disclose or use any Cardinal Health Confidential Information for any purpose other than to exercise its rights hereunder. Participant shall protect the Cardinal Health Confidential Information in the same manner that it protects the confidentiality of its own proprietary and confidential information of like kind, but in no event shall it exercise less than reasonable care in protecting such Confidential Information. If Participant is compelled by law to disclose any Cardinal Health Confidential Information, it shall provide Cardinal Health with prior notice of such compelled disclosure and reasonable assistance to contest the disclosure at Cardinal Health's request and expense.

6. **Protected Health Information.** Cardinal will comply with all applicable privacy laws and regulations in providing the Program to Participant, including without limitation, the Health Insurance Portability and Accountability Act and the privacy regulations promulgated thereunder ("HIPAA").

7. **Limitation of Liability.** CARDINAL SHALL NOT BE LIABLE FOR ANY INDIRECT, SPECIAL OR CONSEQUENTIAL DAMAGES, EVEN IF IT IS ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. NOTWITHSTANDING ANYTHING TO THE CONTRARY, CARDINAL'S AGGREGATE LIABILITY HEREUNDER SHALL NOT EXCEED THE FEES PAID TO IT HEREUNDER.

8. **Indemnification.** Participant shall defend, indemnify and hold Cardinal its successors, assigns, officers, directors, and employees harmless with respect to all fines, penalties, claims, liability, damage, loss and expenses, and penalties imposed upon Cardinal including reasonable attorney's fees which are related to, caused by, or arise out of the Enrollment or in connection with: (i) receipt by Cardinal of inaccurate, false or misleading information; (ii) fraud, negligence or willful misconduct of Participant; and, (iii) violation of any laws or regulations, except to the extent that any of the foregoing arise from the negligence or willful misconduct of Cardinal. Participant shall pay Cardinal reasonable attorney's fees and all costs of litigation associated with enforcement of the obligation set forth in this section.



**CardinalHealth**

*Essential to care™*

© 2018 Cardinal Health. All rights reserved. CARDINAL HEALTH, the Cardinal Health LOGO and ESSENTIAL TO CARE are trademarks of Cardinal Health and may be registered in the US and/or in other countries. All other marks are the property of their respective owners. Lit. No. 1RI18-769745 (02/2018)

cardinalhealth.com

## Independent Pharmacy Returns Program

# Enrollment form

The Independent Pharmacy Returns Program is designed to simplify the labor-intensive and time-consuming process of tracking credits when returning unsalable merchandise to third-party returns processors. The traditional process requires that the pharmacy track credits occurring during a period of 18 to 24 months back to a third-party return submission.

**Because pharmacies are returning unsalable product periodically throughout the year, the effort required to** correlate the credits to the correct request is oftentimes difficult. In addition, while these submissions are unresolved the pharmacy does not have access to valuable working capital dollars. This Independent Pharmacy Returns Program, a pre-funded solution, dramatically decreases the time from return submission to receipt of cash. It also outsources the laborious task of tracking what returns have been processed and correlating credits to specific products. The Independent Pharmacy Returns Program simplifies the process of returning unsalable merchandise previously purchased from Cardinal Health. Thus, the program is available only to Cardinal Health customers that have executed a Prime Vendor Agreement (PVA). Products purchased from a source other than Cardinal Health will not be processed.

We have partnered with both Inmar® and Pharma Logistics® processors for this program. To take advantage of the Independent Pharmacy Returns Program, you must first register with either Inmar® or Pharma Logistics®.

Once enrolled, Inmar® or Pharma Logistics® will contact you to train you on their specific returns process.

## Enroll now for immediate benefits!

Select one: ☒ Inmar    ☐ Pharma Logistics

**Pharmacy name** Autrey Pharmacy 4

**Pharmacy address** 3503 Boca chica Bludste#1    **City** Brownsville    **State** TX    **Zip** 78521

**Pharmacy phone number** 956-621-1000    **Pharmacy fax number** 956-542-5103

**Primary contact** Srinivas Gadiraju    **Contact email** Brownsvillepharmacies@gmail.com

**DEA number** _____ (a copy of your DEA license may be requested at a later date)    **DEA expiration date** 06-30-2020

**Signature** _____    **Date** 01-23-2020

**Printed name** Srinivas Gadiraju

**Title / position** President

Your signature above indicates that you have read, understand and agree to the terms and conditions of the Independent Pharmacy Returns Program located on the reverse side of this enrollment form.

**CardinalHealth**
Essential to care™

EXHIBIT
8

## Independent Pharmacy Returns Program
## Terms and Conditions.

1. **Program Standards.** Cardinal has the right to review the returns submitted to Inmar and Pharma Logistic. If the returns appears to be based on suspicious conduct, Cardinal may, acting in its sole discretion, delay payment until the matter is resolved to Cardinal's satisfaction. Cardinal has the right to adjust pricing applied to the returns by Inmar and Pharma Logistic based on actual value of the returns.

2. **Term**

a. <u>Term of Program.</u> Participation in the Program shall be effective as of the Effective Date and will continue in effect for a period of twelve (12) months and shall automatically renew for successive twelve (12) month periods, unless terminated as proved below.

b. <u>Termination by Participant.</u> Participant may terminate enrollment in the Program for its convenience upon giving Cardinal sixty (60) days' prior written notice.

c. <u>Termination by Cardinal.</u>

   i. Cardinal may terminate Participant's enrollment in the Program immediately if Cardinal has reason to believe, acting its sole discretion, that Participant has or is attempting to (i) divert product for purposes contrary to the intent of the Program, such as but not limited to, purchasing product for the sole purpose of returning it through the Program, including short-dated products; (ii) returning product purchased from a source other than Cardinal Health; and (iii) engaging in misleading and unethical activities.

   ii. Cardinal may terminate Participant's enrollment in the Program without cause upon providing Participant (30) day's prior written notice.

   iii. Notwithstanding the above, Cardinal reserves the right to terminate the entire Program, in whole or in part, acting in its sole discretion.

3. **Program Costs.** Cardinal will pay to Participant 80% of the total returnable value of the unsaleable product, which takes into consideration Cardinal's labor costs associated with tracking/ reconciling the credits. The third-party processor fees associated with the Program are paid by Cardinal. The percent of the returnable value of unsaleable product received by Cardinal is fair and adequate compensation based on the fair market price of administering the Program.

4. **Warranty Disclaimer.** ALL SERVICES PROVIDED BY CARDINAL HEALTH HEREUNDER ARE PROVIDED AS IS WITHOUT ANY REPRESENTATIONS OR WARRANTIES OF ANY KIND. EXCEPT AS EXPRESSLY PROVIDED HEREIN, CARDINAL HEALTH MAKES NO WARRANTY OF ANY KIND, WHETHER EXPRESS, IMPLIED, STATUTORY, OR OTHERWISE, INCLUDING WITHOUT LIMITATION ANY IMPLIED WARRANTIES OF TITLE, NON-INFRINGEMENT, INFORMATION, MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE (WHETHER OR NOT CARDINAL HEALTH KNOWS OR HAS REASON

TO KNOW OF SUCH PURPOSE), WHETHER ARISING BY LAW, CUSTOM, USAGE IN THE TRADE OR BY COURSE OF DEALING. IN NO EVENT SHALL CARDINAL HEALTH HAVE ANY LIABILITY TO PARTICIPANT FOR ANY LOST PROFITS, LOSS OF DATA, LOSS OF USE, COSTS OF PROCUREMENT OR SUBSTITUTE GOODS OR SERVICES.

5. **Confidentiality.** Participant agrees that the Program, this Enrollment, and the terms hereof, and any information or material that Cardinal or Processors may provide or which Participant may become aware regarding the Program, including information related to Cardinal's business plans, systems, processes and strategies, all constitute and is defined as "Cardinal Health Confidential Information". Participant shall not disclose or use any Cardinal Health Confidential Information for any purpose other than to exercise its rights hereunder. Participant shall protect the Cardinal Health Confidential Information in the same manner that it protects the confidentiality of its own proprietary and confidential information of like kind, but in no event shall it exercise less than reasonable care in protecting such Confidential Information. If Participant is compelled by law to disclose any Cardinal Health Confidential Information, it shall provide Cardinal Health with prior notice of such compelled disclosure and reasonable assistance to contest the disclosure at Cardinal Health's request and expense.

6. **Protected Health Information.** Cardinal will comply with all applicable privacy laws and regulations in providing the Program to Participant, including without limitation, the Health Insurance Portability and Accountability Act and the privacy regulations promulgated thereunder ("HIPAA").

7. **Limitation of Liability.** CARDINAL SHALL NOT BE LIABLE FOR ANY INDIRECT, SPECIAL OR CONSEQUENTIAL DAMAGES, EVEN IF IT IS ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. NOTWITHSTANDING ANYTHING TO THE CONTRARY, CARDINAL'S AGGREGATE LIABILITY HEREUNDER SHALL NOT EXCEED THE FEES PAID TO IT HEREUNDER.

8. **Indemnification.** Participant shall defend, indemnify and hold Cardinal its successors, assigns, officers, directors, and employees harmless with respect to all fines, penalties, claims, liability, damage, loss and expenses, and penalties imposed upon Cardinal including reasonable attorney's fees which are related to, caused by, or arise out of the Enrollment or in connection with: (i) receipt by Cardinal of inaccurate, false or misleading information; (ii) fraud, negligence or willful misconduct of Participant; and, (iii) violation of any laws or regulations, except to the extent that any of the foregoing arise from the negligence or willful misconduct of Cardinal. Participant shall pay Cardinal reasonable attorney's fees and all costs of litigation associated with enforcement of the obligation set forth in this section.



**Cardinal**Health

*Essential to care™*

© 2018 Cardinal Health. All rights reserved. CARDINAL HEALTH, the Cardinal Health LOGO and ESSENTIAL TO CARE are trademarks of Cardinal Health and may be registered in the US and/or in other countries. All other marks are the property of their respective owners. Lit. No. 1RI18-769745 (02/2018)

cardinalhealth.com

## Independent Pharmacy Returns Program

# Enrollment form

The Independent Pharmacy Returns Program is designed to simplify the labor-intensive and time-consuming process of tracking credits when returning unsalable merchandise to third-party returns processors. The traditional process requires that the pharmacy track credits occurring during a period of 18 to 24 months back to a third-party return submission.

Because pharmacies are returning unsalable product periodically throughout the year, the effort required to correlate the credits to the correct request is oftentimes difficult. In addition, while these submissions are unresolved the pharmacy does not have access to valuable working capital dollars. This independent Pharmacy Returns Program, a pre-funded solution, dramatically decreases the time from return submission to receipt of cash. It also outsources the laborious task of tracking what returns have been processed and correlating credits to specific products. The Independent Pharmacy Returns Program simplifies the process of returning unsalable merchandise previously purchased from Cardinal Health. Thus, the program is available only to Cardinal Health customers that have executed a Prime Vendor Agreement (PVA). Products purchased from a source other than Cardinal Health will not be processed.

We have partnered with both Inmar® and Pharma Logistics® processors for this program. To take advantage of the Independent Pharmacy Returns Program, you must first register with either Inmar® or Pharma Logistics®.

Once enrolled, Inmar® or Pharma Logistics® will contact you to train you on their specific returns process.

## Enroll now for immediate benefits!

Select one: ☒ Inmar    ☐ Pharma Logistics

Autrey Pharmacy 2
**Pharmacy name**

1365 E Ruben Torres Blvd    Brownsville    TX    78521
**Pharmacy address**                                **City**        **State**    **Zip**

956-542-5100                        956-542-5103
**Pharmacy phone number**            **Pharmacy fax number**

Srinivasa Gadiraju                  Brownsvillepharmacies@gmail.com
**Primary contact**                 **Contact email**

                                    06-30-2021
**DEA number**    (a copy of your DEA license may be requested at a later date)    **DEA expiration date**

                                    01-24-2020
**Signature**                        **Date**

Srinivas Gadiraju
**Printed name**

President
**Title / position**

Your signature above indicates that you have read, understand and agree to the terms and conditions of the Independent Pharmacy Returns Program located on the reverse side of this enrollment form.

**Cardinal**Health
*Essential to care™*

EXHIBIT

9

## Independent Pharmacy Returns Program
## Terms and Conditions.

1. **Program Standards.** Cardinal has the right to review the returns submitted to Inmar and Pharma Logistic. If the returns appears to be based on suspicious conduct, Cardinal may, acting in its sole discretion, delay payment until the matter is resolved to Cardinal's satisfaction. Cardinal has the right to adjust pricing applied to the returns by Inmar and Pharma Logistic based on actual value of the returns.

2. **Term**

a. Term of Program. Participation in the Program shall be effective as of the Effective Date and will continue in effect for a period of twelve (12) months and shall automatically renew for successive twelve (12) month periods, unless terminated as proved below.

b. Termination by Participant. Participant may terminate enrollment in the Program for its convenience upon giving Cardinal sixty (60) days' prior written notice.

c. Termination by Cardinal.

   i. Cardinal may terminate Participant's enrollment in the Program immediately if Cardinal has reason to believe, acting its sole discretion, that Participant has or is attempting to (i) divert product for purposes contrary to the intent of the Program, such as but not limited to, purchasing product for the sole purpose of returning it through the Program, including short-dated products; (ii) returning product purchased from a source other than Cardinal Health; and (iii) engaging in misleading and unethical activities.

   ii. Cardinal may terminate Participant's enrollment in the Program without cause upon providing Participant (30) day's prior written notice.

   iii. Notwithstanding the above, Cardinal reserves the right to terminate the entire Program, in whole or in part, acting in its sole discretion.

3. **Program Costs.** Cardinal will pay to Participant 80% of the total returnable value of the unsaleable product, which takes into consideration Cardinal's labor costs associated with tracking/reconciling the credits. The third-party processor fees associated with the Program are paid by Cardinal. The percent of the returnable value of unsaleable product received by Cardinal is fair and adequate compensation based on the fair market price of administering the Program.

4. **Warranty Disclaimer.** ALL SERVICES PROVIDED BY CARDINAL HEALTH HEREUNDER ARE PROVIDED AS IS WITHOUT ANY REPRESENTATIONS OR WARRANTIES OF ANY KIND. EXCEPT AS EXPRESSLY PROVIDED HEREIN, CARDINAL HEALTH MAKES NO WARRANTY OF ANY KIND, WHETHER EXPRESS, IMPLIED, STATUTORY, OR OTHERWISE, INCLUDING WITHOUT LIMITATION ANY IMPLIED WARRANTIES OF TITLE, NON-INFRINGEMENT, INFORMATION, MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE (WHETHER OR NOT CARDINAL HEALTH KNOWS OR HAS REASON TO KNOW OF SUCH PURPOSE), WHETHER ARISING BY LAW, CUSTOM, USAGE IN THE TRADE OR BY COURSE OF DEALING. IN NO EVENT SHALL CARDINAL HEALTH HAVE ANY LIABILITY TO PARTICIPANT FOR ANY LOST PROFITS, LOSS OF DATA, LOSS OF USE, COSTS OF PROCUREMENT OR SUBSTITUTE GOODS OR SERVICES.

5. **Confidentiality.** Participant agrees that the Program, this Enrollment, and the terms hereof, and any information or material that Cardinal or Processors may provide or which Participant may become aware regarding the Program, including information related to Cardinal's business plans, systems, processes and strategies, all constitute and is defined as "Cardinal Health Confidential Information". Participant shall not disclose or use any Cardinal Health Confidential Information for any purpose other than to exercise its rights hereunder. Participant shall protect the Cardinal Health Confidential Information in the same manner that it protects the confidentiality of its own proprietary and confidential information of like kind, but in no event shall it exercise less than reasonable care in protecting such Confidential Information. If Participant is compelled by law to disclose any Cardinal Health Confidential Information, it shall provide Cardinal Health with prior notice of such compelled disclosure and reasonable assistance to contest the disclosure at Cardinal Health's request and expense.

6. **Protected Health Information.** Cardinal will comply with all applicable privacy laws and regulations in providing the Program to Participant, including without limitation, the Health Insurance Portability and Accountability Act and the privacy regulations promulgated thereunder ("HIPAA").

7. **Limitation of Liability.** CARDINAL SHALL NOT BE LIABLE FOR ANY INDIRECT, SPECIAL OR CONSEQUENTIAL DAMAGES, EVEN IF IT IS ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. NOTWITHSTANDING ANYTHING TO THE CONTRARY, CARDINAL'S AGGREGATE LIABILITY HEREUNDER SHALL NOT EXCEED THE FEES PAID TO IT HEREUNDER.

8. **Indemnification.** Participant shall defend, indemnify and hold Cardinal its successors, assigns, officers, directors, and employees harmless with respect to all fines, penalties, claims, liability, damage, loss and expenses, and penalties imposed upon Cardinal including reasonable attorney's fees which are related to, caused by, or arise out of the Enrollment or in connection with: (i) receipt by Cardinal of inaccurate, false or misleading information; (ii) fraud, negligence or willful misconduct of Participant; and, (iii) violation of any laws or regulations, except to the extent that any of the foregoing arise from the negligence or willful misconduct of Cardinal. Participant shall pay Cardinal reasonable attorney's fees and all costs of litigation associated with enforcement of the obligation set forth in this section.



**Cardinal**Health

*Essential to care™*

© 2018 Cardinal Health. All rights reserved. CARDINAL HEALTH, the Cardinal Health LOGO and ESSENTIAL TO CARE are trademarks of Cardinal Health and may be registered in the US and/or in other countries. All other marks are the property of their respective owners. Lit. No. 1RI18-769745 (02/2018)

cardinalhealth.com

## Independent Pharmacy Returns Program

# Enrollment form

The Independent Pharmacy Returns Program is designed to simplify the labor-intensive and time-consuming process of tracking credits when returning unsalable merchandise to third-party returns processors. The traditional process requires that the pharmacy track credits occurring during a period of 18 to 24 months back to a third-party return submission.

Because pharmacies are returning unsalable product periodically throughout the year, the effort required to correlate the credits to the correct request is oftentimes difficult. In addition, while these submissions are unresolved the pharmacy does not have access to valuable working capital dollars. This Independent Pharmacy Returns Program, a pre-funded solution, dramatically decreases the time from return submission to receipt of cash. It also outsources the laborious task of tracking what returns have been processed and correlating credits to specific products. The Independent Pharmacy Returns Program simplifies the process of returning unsalable merchandise previously purchased from Cardinal Health. Thus, the program is available only to Cardinal Health customers that have executed a Prime Vendor Agreement (PVA). Products purchased from a source other than Cardinal Health will not be processed.

We have partnered with both Inmar® and Pharma Logistics® processors for this program. To take advantage of the Independent Pharmacy Returns Program, you must first register with either Inmar® or Pharma Logistics®.

Once enrolled, Inmar® or Pharma Logistics® will contact you to train you on their specific returns process.

### Enroll now for immediate benefits!

Select one:  ☑ Inmar     ☐ Pharma Logistics

**Pharmacy name** Fry's Prescription Pharmacy

**Pharmacy address** 811 N Sam Houston Blud   **City** San Benito **State** Tx   **Zip** 78586

**Pharmacy phone number** 956-399-2453   **Pharmacy fax number** 956-399-2959

**Primary contact** Srinivas Gadivaju   **Contact email** Brownsvillepharmacies@gmail.com

**DEA number** _(a copy of your DEA license may be requested at a later date)_   **DEA expiration date** 09-30-2021

**Signature** _(signed)_   **Date** 01-24-2020

**Printed name** Srinivas Gadivaju

**Title / position** President

Your signature above indicates that you have read, understand and agree to the terms and conditions of the Independent Pharmacy Returns Program located on the reverse side of this enrollment form.



**CardinalHealth**
Essential to care™

EXHIBIT
10

## Independent Pharmacy Returns Program
## Terms and Conditions.

1. **Program Standards.** Cardinal has the right to review the returns submitted to Inmar and Pharma Logistic. If the returns appears to be based on suspicious conduct, Cardinal may, acting in its sole discretion, delay payment until the matter is resolved to Cardinal's satisfaction. Cardinal has the right to adjust pricing applied to the returns by Inmar and Pharma Logistic based on actual value of the returns.

2. **Term**

a. Term of Program. Participation in the Program shall be effective as of the Effective Date and will continue in effect for a period of twelve (12) months and shall automatically renew for successive twelve (12) month periods, unless terminated as proved below.

b. Termination by Participant. Participant may terminate enrollment in the Program for its convenience upon giving Cardinal sixty (60) days' prior written notice.

c. Termination by Cardinal.

   i. Cardinal may terminate Participant's enrollment in the Program immediately if Cardinal has reason to believe, acting its sole discretion, that Participant has or is attempting to (i) divert product for purposes contrary to the intent of the Program, such as but not limited to, purchasing product for the sole purpose of returning it through the Program, including short-dated products; (ii) returning product purchased from a source other than Cardinal Health; and (iii) engaging in misleading and unethical activities.

   ii. Cardinal may terminate Participant's enrollment in the Program without cause upon providing Participant (30) day's prior written notice.

   iii. Notwithstanding the above, Cardinal reserves the right to terminate the entire Program, in whole or in part, acting in its sole discretion.

3. **Program Costs.** Cardinal will pay to Participant 80% of the total returnable value of the unsaleable product, which takes into consideration Cardinal's labor costs associated with tracking/reconciling the credits. The third-party processor fees associated with the Program are paid by Cardinal. The percent of the returnable value of unsaleable product received by Cardinal is fair and adequate compensation based on the fair market price of administering the Program.

4. **Warranty Disclaimer.** ALL SERVICES PROVIDED BY CARDINAL HEALTH HEREUNDER ARE PROVIDED AS IS WITHOUT ANY REPRESENTATIONS OR WARRANTIES OF ANY KIND. EXCEPT AS EXPRESSLY PROVIDED HEREIN, CARDINAL HEALTH MAKES NO WARRANTY OF ANY KIND, WHETHER EXPRESS, IMPLIED, STATUTORY, OR OTHERWISE, INCLUDING WITHOUT LIMITATION ANY IMPLIED WARRANTIES OF TITLE, NON-INFRINGEMENT, INFORMATION, MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE (WHETHER OR NOT CARDINAL HEALTH KNOWS OR HAS REASON TO KNOW OF SUCH PURPOSE), WHETHER ARISING BY LAW, CUSTOM, USAGE IN THE TRADE OR BY COURSE OF DEALING. IN NO EVENT SHALL CARDINAL HEALTH HAVE ANY LIABILITY TO PARTICIPANT FOR ANY LOST PROFITS, LOSS OF DATA, LOSS OF USE, COSTS OF PROCUREMENT OR SUBSTITUTE GOODS OR SERVICES.

5. **Confidentiality.** Participant agrees that the Program, this Enrollment, and the terms hereof, and any information or material that Cardinal or Processors may provide or which Participant may become aware regarding the Program, including information related to Cardinal's business plans, systems, processes and strategies, all constitute and is defined as "Cardinal Health Confidential Information". Participant shall not disclose or use any Cardinal Health Confidential Information for any purpose other than to exercise its rights hereunder. Participant shall protect the Cardinal Health Confidential Information in the same manner that it protects the confidentiality of its own proprietary and confidential information of like kind, but in no event shall it exercise less than reasonable care in protecting such Confidential Information. If Participant is compelled by law to disclose any Cardinal Health Confidential Information, it shall provide Cardinal Health with prior notice of such compelled disclosure and reasonable assistance to contest the disclosure at Cardinal Health's request and expense.

6. **Protected Health Information.** Cardinal will comply with all applicable privacy laws and regulations in providing the Program to Participant, including without limitation, the Health Insurance Portability and Accountability Act and the privacy regulations promulgated thereunder ("HIPAA").

7. **Limitation of Liability.** CARDINAL SHALL NOT BE LIABLE FOR ANY INDIRECT, SPECIAL OR CONSEQUENTIAL DAMAGES, EVEN IF IT IS ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. NOTWITHSTANDING ANYTHING TO THE CONTRARY, CARDINAL'S AGGREGATE LIABILITY HEREUNDER SHALL NOT EXCEED THE FEES PAID TO IT HEREUNDER.

8. **Indemnification.** Participant shall defend, indemnify and hold Cardinal its successors, assigns, officers, directors, and employees harmless with respect to all fines, penalties, claims, liability, damage, loss and expenses, and penalties imposed upon Cardinal including reasonable attorney's fees which are related to, caused by, or arise out of the Enrollment or in connection with: (i) receipt by Cardinal of inaccurate, false or misleading information; (ii) fraud, negligence or willful misconduct of Participant; and, (iii) violation of any laws or regulations, except to the extent that any of the foregoing arise from the negligence or willful misconduct of Cardinal. Participant shall pay Cardinal reasonable attorney's fees and all costs of litigation associated with enforcement of the obligation set forth in this section.



**CardinalHealth**

Essential to care™

© 2018 Cardinal Health. All rights reserved. CARDINAL HEALTH, the Cardinal Health LOGO and ESSENTIAL TO CARE are trademarks of Cardinal Health and may be registered in the US and/or in other countries. All other marks are the property of their respective owners. Lit. No. 1RI18-769745 (02/2018)

cardinalhealth.com



Erin L. Gapinski
Director, Assistant General Counsel
Credit
614.757.9964 dir.
614.553.9007 fax
Erin.Gapinski@cardinalhealth.com

Cardinal Health
7000 Cardinal Place
Dublin, Ohio 43017
614.757.5000 main

www.cardinal.com

February 8, 2024

**VIA OVERNIGHT FEDEX SERVICE**

Brownsville Pharmacy # 3 LLC
800 E Alton Gloor Blvd Unit B
Brownsville, TX 78526

Srinivasa Talla, Guarantor
406 Vassar Pl
Fishkill, NY 12524

**Re: Outstanding Obligation of Brownsville Pharmacy #3 LLC to
Cardinal Health 110, LLC**

Dear Addressee:

I am Director, Assistant General Counsel for Cardinal Health, Inc. ("CHI"). CHI is the parent company of Cardinal Health 110, LLC ("Cardinal Health"). The purpose of this letter is to notify you, in your capacity as principal and guarantor of Brownsville Pharmacy #3 LLC (the "Pharmacy") of outstanding obligations owed to Cardinal Health. As you may be aware, the Pharmacy returned various ineligible products for credit, and Cardinal Health passed along the value of such ineligible returns in the sum of $125,114.97 (the "Ineligible Credit Amount") to the Pharmacy. The Pharmacy must repay the Ineligible Credit Amount immediately. Cardinal Health reserves all of its legal and equitable rights to collect the Ineligible Credit Amount, as well as other costs and expenses, including legal fees.

Upon receipt of this letter, please contact Jackie Albert at Jackie.Albert@cardinalhealth.com to discuss payment arrangements of the Ineligible Credit Amount. Failure to respond by February 22, 2024, will result in legal proceedings being initiated by Cardinal Health to collect this debt.

Sincerely,

Erin Gapinski
Director, Assistant General Counsel

cc:    Amy Calvert
       Jackie Albert



EXHIBIT

11

CardinalHealth

**Erin L. Gapinski**
Director, Assistant General Counsel
Credit
614.757.9964 dir.
614.553.9007 fax
Erin.Gapinski@cardinalhealth.com

Cardinal Health
7000 Cardinal Place
Dublin, Ohio 43017
614.757.5000 main

www.cardinal.com

February 8, 2024

**VIA OVERNIGHT FEDEX SERVICE**

Harlingen Pharmacy LLC
1616 N Ed Carey Dr
Harlingen, TX 78550

Srinivasa Talla, Guarantor
406 Vassar Pl
Fishkill, NY 12524

**Re: Outstanding Obligation of Harlingen Pharmacy LLC to**
**Cardinal Health 110, LLC**

Dear Addressees:

I am Director, Assistant General Counsel for Cardinal Health, Inc. ("CHI"). CHI is the parent company of Cardinal Health 110, LLC ("Cardinal Health"). The purpose of this letter is to notify you, in your capacity as principal and guarantor of Harlingen Pharmacy LLC (the "Pharmacy") of outstanding obligations owed to Cardinal Health. As you may be aware, the Pharmacy returned various ineligible products for credit, and Cardinal Health passed along the value of such ineligible returns in the sum of $123,706.30 (the "Ineligible Credit Amount") to the Pharmacy. The Pharmacy must repay the Ineligible Credit Amount immediately. Cardinal Health reserves all of its legal and equitable rights to collect the Ineligible Credit Amount, as well as other costs and expenses, including legal fees.

Upon receipt of this letter, please contact Jackie Albert at Jackie.Albert@cardinalhealth.com to discuss payment arrangements of the Ineligible Credit Amount. Failure to respond by February 22, 2024, will result in legal proceedings being initiated by Cardinal Health to collect this debt.

Sincerely,

Erin Gapinski
Director, Assistant General Counsel

cc:     Jackie Albert
        Amy Calvert


EXHIBIT
12


**Cardinal**Health

| | |
|---|---|
| **Erin L. Gapinski**<br>Director, Assistant General Counsel<br>Credit<br>614.757.9964 dir.<br>614.553.9007 fax<br>Erin.Gapinski@cardinalhealth.com | Cardinal Health<br>7000 Cardinal Place<br>Dublin, Ohio 43017<br>614.757.5000 main<br><br>www.cardinal.com |

February 8, 2024

**VIA OVERNIGHT FEDEX SERVICE**

Brownsville Pharmacy # 4 LLC
3503 Boca Chica Blvd Ste 1
Brownsville, TX 78521

Srinivasa Talla, Guarantor
406 Vassar Pl
Fishkill, NY 12524

**Re: Outstanding Obligation of Brownsville Pharmacy # 4 LLC to
Cardinal Health 110, LLC**

Dear Addressees:

I am Director, Assistant General Counsel for Cardinal Health, Inc. ("CHI"). CHI is the parent company of Cardinal Health 110, LLC ("Cardinal Health"). The purpose of this letter is to notify you, in your capacity as principal and guarantor of Brownsville Pharmacy #4 LLC (the "Pharmacy") of outstanding obligations owed to Cardinal Health. As you may be aware, the Pharmacy returned various ineligible products for credit, and Cardinal Health passed along the value of such ineligible returns in the sum of $102,908.49 (the "Ineligible Credit Amount") to the Pharmacy. The Pharmacy must repay the Ineligible Credit Amount immediately. Cardinal Health reserves all of its legal and equitable rights to collect the Ineligible Credit Amount, as well as other costs and expenses, including legal fees.

Upon receipt of this letter, please contact Jackie Albert at Jackie.Albert@cardinalhealth.com to discuss payment arrangements of the Ineligible Credit Amount. Failure to respond by February 22, 2024, will result in legal proceedings being initiated by Cardinal Health to collect this debt.

Sincerely,

Erin Gapinski
Director, Assistant General Counsel

cc:    Amy Calvert
       Jackie Albert


**EXHIBIT**
**13**



Erin L. Gapinski
Director, Assistant General Counsel
Credit
614.757.9964 dir.
614.553.9007 fax
Erin.Gapinski@cardinalhealth.com

Cardinal Health
7000 Cardinal Place
Dublin, Ohio 43017
614.757.5000 main

www.cardinal.com

February 8, 2024

**VIA OVERNIGHT FEDEX SERVICE**
Brownsville Pharmacy # 2 LLC
1365 E Ruben Torres SR Blvd
Brownsville, TX 78521

Srinivasa Talla, Guarantor
406 Vassar Pl
Fishkill, NY 12524

Srinivas Gadiraju, Guarantor
1 Overlook Dr
Riverdale, NJ 07457

<p style="text-align:center"><b>Re: Outstanding Obligation of Brownsville Pharmacy #2 LLC to
Cardinal Health 110, LLC</b></p>

Dear Addressees:

I am Director, Assistant General Counsel for Cardinal Health, Inc. ("CHI"). CHI is the parent company of Cardinal Health 110, LLC ("Cardinal Health"). The purpose of this letter is to notify you, in your capacity as principal and guarantor of Brownsville Pharmacy #2 LLC (the "Pharmacy") of outstanding obligations due to Cardinal Health. As you may be aware, the Pharmacy returned various ineligible products for credit, and Cardinal Health passed along the value of such ineligible returns in the sum of $64,505.06 (the "Ineligible Credit Amount") to the Pharmacy. The Pharmacy must repay the Ineligible Credit Amount immediately. Cardinal Health reserves all of its legal and equitable rights to collect the Ineligible Credit Amount, as well as other costs and expenses, including legal fees.

Upon receipt of this letter, please contact Jackie Albert at Jackie.Albert@cardinalhealth.com to discuss payment arrangements of the Ineligible Credit Amount. Failure to respond by February 22, 2024, will result in legal proceedings being initiated by Cardinal Health to collect this debt.

Sincerely,

Erin Gapinski
Director, Assistant General Counsel

cc:    Priya Patel
       Jackie Albert

